**MONAT CAPITAL CORPORATION,**
**Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 93–2217–GTV.**

United States District Court,
D. Kansas.

Nov. 8, 1994.

Terrance M. Summers, Douglas J. Schmidt, Ernest M. Fleischer, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, for plaintiff Monat Capital Corp.

Janice M. Karlin, Office of U.S. Atty., Kansas City, KS, Seth G. Heald, U.S. Dept. of Justice, Office of Sp. Litigation–Tax Div., Washington, DC, for defendant U.S.

### MEMORANDUM AND ORDER

BEBBER, District Judge.

### I. Introduction

This is a civil tax refund suit brought pursuant to 28 U.S.C. § 1346(a)(1), in which

the plaintiff, Monat Capital Corporation (Monat), seeks refund of $1,134,485.78 and $175,017.91 of federal income taxes and related additions paid for the years 1988 and 1989, respectively. The tax liability at issue here arises out of Internal Revenue Code provisions dealing with a tax on life insurance companies. The specific legal question involves the tax treatment of certain tax deferred income after an insurance company has been liquidated.

The parties have stipulated to the relevant facts and only legal issues remain. Both Monat (Doc. 31) and the United States (Doc. 33) have filed motions for summary judgment. For the reasons set forth below, the court grants Monat's motion for summary judgment and denies the summary judgment motion filed by the United States.

## II. Facts

The facts were fully stipulated for purposes of this case, and the court incorporates those facts in this decision. The facts set out here are those which are relevant to the outcome of the case or necessary for background understanding.

Monat is a Missouri corporation with its principal place of business in Kansas. At all relevant times, Monat owned all the equity stock of Missouri National Life Insurance Company (Missouri National), a life insurance company subject to the laws and regulations of the State of Missouri. Missouri National owned all the equity stock of Amalgamated Labor Life Insurance Company (Amalgamated), a life insurance company subject to the laws and regulations of the State of Illinois. Monat filed consolidated federal income tax returns with these two subsidiaries.

By 1989 both Missouri National and Amalgamated were declared insolvent. The insurance regulators of the respective states seized the companies for liquidation, and courts in both states appointed receivers to proceed with the liquidations. Both receiverships had insufficient funds to satisfy policyholder claims. As a result, no assets of the companies have or will be distributed directly or indirectly to the companies' shareholders.

Because of the receivership liquidations, the Internal Revenue Service (IRS) determined that Amalgamated last met the tax definition of a life insurance company in 1988, and Missouri National last met the definition in 1989. Monat had filed consolidated income tax returns showing no tax due for those years. Those tax returns are not in dispute. In 1992 and 1993, however, the IRS assessed against Monat the amounts from tax years 1988 and 1989 which are in dispute in this litigation. The IRS based its assessment on the fact that the two companies had failed to qualify as life insurance companies for two consecutive tax years. As a result, the IRS determined that the balance of the policyholders surplus accounts of those companies must be included as income and could not be offset by the companies' losses.

The amounts of taxes (T), interest (I), penalties (P), and lien fee (L) assessed for tax years 1988 and 1989 are as follows:

### 1988

| Amount Assessed | | Date Assessed |
|---|---|---|
| $ 694,373.00 | (T) | 1/27/92 |
| 254,029.45 | (I) | 1/27/92 |
| 4.50 | (L) | 7/13/92 |
| 93,710.95 | (P) | 5/10/93 |
| 92,694.58 | (I) | 5/10/93 |

Total:    $1,134,812.48

### 1989

| Amount Assessed | | Date Assessed |
|---|---|---|
| $ 140,920.00 | (T) | 3/09/92 |
| 30,753.70 | (I) | 3/09/92 |
| 3,344.21 | (I) | 5/10/93 |

Total:    $175,017.91

The interest assessed on the tax for 1988 and 1989 was computed from the due dates of Monat's original returns for those years.

The tax assessments were paid in full by Missouri National's receiver on behalf of Monat from Missouri National's funds. The Missouri National receiver paid these disputed amounts to the IRS in order to avoid potential personal liability as a result of the superpriority statute, 31 U.S.C. § 3713. No payments were made by the Amalgamated receiver because Section 205(1) of the Illinois Insurance Code grants priority to claims of policyholders of insolvent insurance companies over unsecured claims for federal taxes.

Monat filed claims for refund with the IRS for the taxes and payments described above, but the IRS denied the refund claims. The amounts in dispute in this litigation are overpayments if the amounts in the policyholders surplus accounts either do not constitute income for 1988 and 1989 or do constitute income for those years but can be offset by the companies' losses.

### III. Statutory Scheme

The federal income taxation of life insurance companies is governed by a separate portion of the Internal Revenue Code (I.R.C.), Subchapter L, which consists of I.R.C. (26 U.S.C.) §§ 801 *et seq.* This tax refund case requires the court to interpret provisions of Subchapter L in effect both before and after amendments made by the Deficit Reduction Act of 1984 (DEFRA), Pub.L. No. 98–369.

### A. The 1959 Act

"There are two possible sources of income for life insurance companies, from underwriting and from investment. Underwriting income is derived from the excess of gross premiums over expenses and mortality experience. Investment income is derived from the opportunity to invest the long term policy reserve." *Economy Fin. Corp. v. United States,* 501 F.2d 466, 474 (7th Cir.1974), *cert. denied,* 420 U.S. 947, 95 S.Ct. 1328, 43 L.Ed.2d 425 (1975). Prior to 1959, life insurers were not subject to tax on their underwriting activity. In 1959, Congress decided to institute a comprehensive system for taxing life insurance companies. This legislation[1] brought underwriting income into the income tax base, but deferred tax on a portion of those profits.

Under the 1959 Act, in effect from 1958 through 1983, a three-phase approach was used for determining a life insurance company's taxable income. *See* I.R.C. § 802(b); *North Central Life Ins. Co. v. Commissioner,* 92 T.C. 254, 1989 WL 7477 (1989). Phase I income was the lesser of: (1) the company's share of taxable investment income (as defined in Section 804); or (2) gain from opera-

tions (as defined in Section 809). I.R.C. § 802(b)(1). Phase II income was 50 percent of the amount (if any) by which the gain from operations exceeded investment income. I.R.C. § 802(b)(2). Thus, under Phases I and II, a life insurance company was taxed on the lesser of taxable investment income or gain from operations, plus 50% of the excess, if any, of gain from operations over taxable investment income.

This 50% taxable excess was then added to the company's "shareholders surplus account," I.R.C. § 815(b)(2), and was not taxed again when distributed to shareholders. The non-taxed half of this excess was added to the "policyholders surplus account" (PSA) and was not taxed until it was subtracted from that account by reason of one of the triggering events defined in Section 815(d). I.R.C. § 802(b)(3). The amount subtracted from the PSA was called Phase III income, and it could not be offset against losses from operations.

Section 802(b)(3) defined Phase III taxable income as: "the amount subtracted from the policyholders surplus account for the taxable year, as determined under section 815." Section 815 was titled "Distributions to Shareholders," and stated the general rule that any distributions to shareholders were to be made first out of the shareholders surplus account, then out of the policyholders surplus account, and finally out of other accounts. I.R.C. § 815(a). Section 815 further provided that the amount "treated under this section as distributed out of the policyholders surplus account" shall be subtracted from the PSA. I.R.C. § 815(c)(3). The term "distribution" for purposes of Section 815 is defined to include, with certain exceptions, "any distribution in redemption of stock or in partial or complete liquidation of the corporation." I.R.C. § 815(f).

Because the PSAs contained tax-deferred income, Congress enacted additional provisions to forestall abuse. *Security Indus. Ins. Co. v. United States,* 702 F.2d 1234, 1241 (5th Cir.1983). Section 815(d)(4) limited the

---

**1.** *See* Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–69, 73 Stat. 112 (1959). This will be referred to as "the 1959 Act."

amounts that could be maintained in the PSA. In addition, Section 815(d)(2) generally provided that when a life insurance company terminates its operations, it must include as income for its last taxable year the amounts held in its PSA.

Relevant to the analysis of this case is Section 815(d)(2)(A) which included the following special rule for treating amounts remaining in a PSA upon termination of a life insurance company:

(2) TERMINATION AS LIFE INSURANCE COMPANY

(A) EFFECT OF TERMINATION. Except as provided in section 381(c)(22) (relating to carryovers in certain corporate readjustments), if—

(i) for any taxable year the taxpayer is not an insurance company, or

(ii) for any two successive taxable years the taxpayer is not a life insurance company,

then the amount taken into account under section 802(b)(3) for the last preceding taxable year for which it was a life insurance company shall be increased (after the application of subparagraph (B)) by the amount remaining in its policyholders surplus account at the close of such last preceding taxable year.

This section required that, except as provided in Section 381(c)(22) relating to carryovers in certain corporate readjustments, a life insurance company that fails for any two successive years to qualify for federal income tax purposes as a life insurance company must include the balance in its PSA in the company's Phase III taxable income under Section 802(b)(3) for the last year in which the company had qualified as a life insurance company.

### B. The 1984 Act

The Deficit Reduction Act of 1984 substantially changed the federal taxation of life insurance companies for tax years beginning after December 31, 1983.[2] The three phase tax was replaced by a "single phase" system based on the corporate tax model. Section

801 imposes a tax, at regular corporate rates, on the amount of life insurance company taxable income (LICTI) for the taxable year. Under Section 801(b), LICTI is defined as life insurance gross income, computed under Section 803, reduced by life insurance company deductions, computed under Section 804.

The 1984 Act prohibited any new additions to PSAs, but did not require life insurance companies with existing PSAs to eliminate the accounts. Section 801(c) applies the provisions of Section 815, entitled "Distributions to Shareholders from Pre-1984 Policyholders Surplus Account," for taxing distributions from a PSA for purposes of determining the tax imposed by Section 801. Section 815(a) states the general rule regarding distribution of these funds:

(a) General Rule.—In the case of a stock life insurance company which has an existing policyholders surplus account, the tax imposed by section 801 for any taxable year shall be the amount which would be imposed by such section for such year on the sum of—

(1) life insurance company taxable income for such year (but not less than zero), plus

(2) the amount of direct and indirect distributions during such year to shareholders from such account.

Thus, the amount of any direct or indirect distribution to shareholders from an existing PSA is added to the LICTI (which is not less than zero) for purposes of determining the tax imposed by Section 801.

Section 815(e) defines the term "existing policyholders surplus account" as a PSA that has a balance at the close of December 31, 1983. Life insurance companies that had existing PSAs were directed to continue their accounts, but forbidden to make any additions to the accounts for any taxable year beginning after December 31, 1983. I.R.C. § 815(d). Each life insurance company that had an existing PSA was also required to continue its shareholders surplus account. I.R.C. § 815(c).

---

**2.** *See* Pub.Law No. 98–369, 98 Stat. 494, 720. This will be referred to as "the 1984 Act." The general effective date of the 1984 Act was January 1, 1984.

Section 815(f) provides transition rules governing the taxation of life insurance companies which had pre–1984 PSAs. It indicates that, except where inconsistent with other provisions, certain Section 815 provisions in effect before the 1984 Act would continue to be applicable to PSAs.[3] One provision still in effect is Section 815(d), which includes section 815(d)(2) governing the taxation of PSAs when a taxpayer loses its status as a life insurance company.

As discussed earlier, the former Section 815(d)(2) required that PSA balances were to be added to the income of the last fiscal year in which the taxpayer was an insurance company. Under the 1959 Act, however, this amount would have been added to the Phase III income as defined in Section 802(b)(3). The 1984 Act eliminated former Section 802 in its entirety, and it was not one of the provisions carried forward by Section 815(f). Thus, the current statute fails to address how these PSA balances are to affect the calculation of income under the new, single-tax scheme.

The Government concedes that "a literal reading of the applicable post–DEFRA statutes leads to a dead end." Memorandum of the United States in Support of its Motion for Summary Judgment at 13. It maintains, however, that termination of the taxpayer's status as a life insurance company automatically results in the taxation of the PSA balance whether or not it is distributed, directly or indirectly, for the benefit of the shareholders.

The plaintiff, on the other hand, maintains that under the single-phase tax scheme, the post-DEFRA section 815(a)(2) treats as taxable income only PSA distributions to shareholders. Indeed, section 815 is titled "Distributions to Shareholders from the Pre–1984 Policyholders Surplus Account" and addresses only distributions to shareholders. Because none of the funds at issue here will be distributed to anyone but policyholders, the plaintiff argues that any inclusion of the PSA balance in taxable income under § 815(f) should be included as part of § 801 income

which would be offset by the losses reported in the applicable tax years.

### IV. Analysis

### A. Taxation of PSA Amounts

The first issue is whether a PSA balance will be treated as taxable income under Section 815 of Subchapter L for a company that has lost its status as a qualified life insurance company for tax purposes due to insolvency, when that balance will only be used to satisfy policyholder claims and will not be directly or indirectly distributed to shareholders. There are no reported decisions addressing this issue.

This analysis must begin with the statutory language. "The starting point for interpretation of a statute is the language of the statute itself." *Kaiser Aluminum & Chem. Corp. v. Bonjorno,* 494 U.S. 827, 835, 110 S.Ct. 1570, 1575, 108 L.Ed.2d 842 (1990). *See also In re Hart,* 923 F.2d 1410, 1415 (10th Cir.1991) ("In interpreting any statute, we begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."). "The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). "The objective of reading the statute is to determine the intent of Congress. The text of the statute itself is the best evidence of that intent. If the statute is clear, that is the end of our inquiry." *Guidry v. Sheet Metal Workers Int'l Ass'n, Local No. 9,* 10 F.3d 700, 708 (10th Cir.1993) (citations omitted).

The problem with applying the literal statutory language to the question in this case can be summarized as follows: The 1959 Act defined certain "triggering events," in former Section 815(d), which would end the tax deferred status of money held in a PSA. These events all resulted in money being "subtracted" from the PSA. Upon the occurrence of

---

3. Those provisions are subsections (d), (e), (f), and (g) of Section 815 as in effect before the 1984 Act. I.R.C. § 815(f).

one of these events, the money subtracted from the PSA would treated as income and subject to the Phase III tax, under former Section 802(b)(3). The 1984 Act carried forward the triggering events provision of the old statute (I.R.C. § 815(d)), but did not carry forward the mechanism for imposing a Phase III tax (I.R.C. § 802(b)(3)).

Because of this ambiguity, it is necessary to look outside the language of the 1984 Act. The question in this case revolves around the proper application of a provision in the 1959 Act, Section 815(d)(2), which was carried forward by the 1984 Act. Therefore, the first question is whether, under the 1959 Act, the termination of life insurance company status triggered a subtraction of the PSA balance and imposition of the Phase III tax, even when the company had been declared insolvent and all available funds had been earmarked to pay policyholder claims. Under a literal reading of the 1959 Act, if, for any two successive years an insurance company failed to qualify as a life insurance company for federal tax purposes, all amounts in its PSA were to be included in Phase III taxable income under § 802(b)(3) for the last year in which the company qualified as a life insurance company. IRC § 815(d)(2).

Plaintiff first argues that the plain language 1959 Act does not necessarily result in the imposition of the Phase III tax on the PSA balance in an insolvency. Plaintiff bases this argument on Section 811 (Section 818 of the pre–1984 Code) which provides that all computations required to determine life insurance company taxes shall be made in a manner consistent with regulatory accounting.[4] Under life insurance regulatory accounting, according to plaintiff, "it is not possible to simultaneously reflect a negative stockholder equity (as in the case of an insolvent life insurance company) and, as a component thereof, a positive accumulated income or loss reserve account (such as a PSA)." Memorandum in Support of Plaintiff's Motion for Summary Judgment at 14. Under this reasoning, no PSA balance would exist at the point that a life insurance company is declared insolvent. Plaintiff uses this argument to explain why there was no need for Congress to specifically exempt insolvent insurance companies from the triggering event defined in Section 815(d)(2).

While plaintiff's analysis of the relevant accounting principles may be correct, the court has no basis on the facts before it to reach such a conclusion. The facts in this case have been stipulated by the parties, and they contain nothing related to the treatment of such account balances upon insolvency. Nor has the plaintiff provided any basis in the statute for concluding that balances can be removed from the PSA in such a fashion.

The Government argues that the literal language of the 1959 Act requires a PSA balance to be taxed upon termination of life insurance company status, regardless of the reason. The Government's position is that the statutory language does not allow for any exceptions based on whether the PSA amounts are actually distributed, directly or indirectly, to shareholders.

The court disagrees with the Government's contention that the statutory language is clear on this point. First, former Section 815, the section that defined the triggering events in which money is "subtracted" from a PSA and thus subject to the Phase III tax, is entitled "Distributions to Shareholders." In addition, Section 815(c) provided that the amount "subtracted" from a PSA is equal to the amount "distributed" out of the PSA. This use of the terms "distributed" and "distribution" was continued by the 1984 Act

4. The current version of that provision reads as follows:

    (a) All computations entering into the determination of the taxes imposed by this part shall be made—

        (1) under an accrual method of accounting, or

        (2) to the extent permitted under regulations prescribed by the Secretary, under a combination of an accrual method of accounting with any other method permitted by this chapter (other than the cash receipts and disbursements method).

To the extent not inconsistent with the preceding sentence or any other provision of this part, all such computations shall be made in a manner consistent with the manner required for purposes of the annual statement approved by the National Association of Insurance Commissioners.

I.R.C. § 811(a).

which defines the current version of the Phase III tax amounts as "direct and indirect distributions ... to shareholders from such account." I.R.C. § 815(a)(2).

These repeated references to distributions to shareholders lead the court to conclude that the 1959 Act's language is ambiguous on the question of whether termination of life insurance company status automatically results in the PSA balance becoming taxable, even if earmarked solely for policyholder claims. Therefore, the court is required to look beyond the plain language of the statute to determine congressional intent. This requires the court to examine the context in which the statute was passed and the relevant legislative history.

The 1959 Act's taxing scheme was designed to tax the underwriting profits of life insurance companies which had previously gone untaxed. According to the Senate Finance Committee's report, "[w]here there is this underwriting gain arising from premium charges in excess of amounts ultimately required to meet claims and expenses, and the excess is *paid out to stockholders,* it would appear that there is income which is properly classified as corporate income for tax purposes." S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.C.C.A.N. 1575, 1581 (emphasis added). Congress decided not to tax all of this income on an annual basis, however, since the "long-term nature of insurance contracts" makes it difficult, if not impossible, to determine the true income of life insurance companies otherwise than by ascertaining over a long period of time the income derived from a "contract or a block of contracts." *Id.* It was for this reason that 50% of the operating income was segregated in a PSA to be taxed "when it is paid out in a distribution to shareholders after the taxed income has been distributed, or when it is voluntarily segregated and held for the benefit of the shareholders." *Id.* at 1581–82. The Senate Report provided further that the Phase III tax on the operating income contained in the PSA was to be taxed "only if more than the income taxed under phases 1 and 2 remaining after tax, is distributed to stockholders." *Id.* at 1576. The Senate Committee explained that the PSAs

"provide a desirable 'cushion' for special contingencies which may arise in the case of the policies involved." *Id.* at 1601. However, the committee concluded that "if the insurance company itself decides to distribute these amounts to stockholders it has demonstrated that this 'cushion' is no longer needed." *Id.*

It is clear from the legislative history that Congress intended to tax any distribution from the tax-deferred PSA balance that benefited shareholders in any way. The legislative history does not, however, provide any meaningful explanation for the provision that upon termination of a life insurance company's status as such, the PSA balance would be taxed.

The Government nevertheless argues that Congress intended that the tax should apply even in situations in which PSA amounts were not being distributed directly or indirectly for the benefit of shareholders. To reach this result in the light of repeated references to the Phase III tax being imposed on "distributions," the Government explains that these other occurrences which triggered the Phase III tax were really "deemed distributions."

The interpretation of the 1959 Act proposed by the Government ignores two things. First, it fails to take into account that Congress intended to tax income from operations only to the extent that such income exceeded policy claims. The establishment of PSA accounts was a recognition that actual policy expenses might not be recognized for some time and could not be predicted with accuracy. If the balance in the plaintiff's PSA is actually earmarked to pay policyholders, as has been stipulated here, then that amount is clearly not a profit to the corporation.

Second, taxing an insolvent life insurance company's PSA balance, which would have the effect of significantly reducing the amount of money available to pay policyholder claims, ignores the purpose behind the PSA "cushion." If the PSA was intended to provide for "contingencies which arise from the policies involved," then use of the fund to cover claims on which the company has defaulted appears to be precisely the kind of contingency anticipated. It would be con-

trary to Congressional intent to allow the Government to tax the cushion merely because it existed at the time the company became insolvent if doing so pulls the cushion out from under the policyholders it was established to protect.

An interpretation more consistent with Congressional intent is that the Section 815(d)(2) provision for triggering taxation of the PSA balance upon termination of life insurance company status was designed to prevent shareholders from taking advantage of the tax deferral system by closing the company's doors but continuing to avoid tax liability on PSA amounts not needed for policyholder claims. Another court has stated that rationale as follows:

> The tax deferral possibilities inherent in the concept of policyholders surplus accounts prompted Congress to enact some additional statutory provisions designed to forestall abuse.... [S]ection 815(d)(2) generally provides that when a life insurance company terminates its operations, it must include in income for its last taxable year the amounts contained in its policyholders surplus account. Thus the tax shelter potential of these surplus accounts is not untrammeled.

*Security Industrial Insurance Co. v. United States,* 702 F.2d 1234, 1241 (5th Cir.1983). In the case at bar, there is no indication that the shareholders of the taxpayer are attempting to take advantage of the ability to defer taxation. Rather the companies are now using funds, previously expected to constitute operational income, to pay contingency·expenses (claims) incurred as part of those operations.

For these reasons, the court concludes that termination of life insurance company status does not trigger taxation of the PSA balance under the 1959 Act when none of that balance will be distributed directly or indirectly to shareholders.

This conclusion is further supported by the amendment to the statute enacted in 1984. As described earlier, the 1984 Act replaced the three phase tax on life insurance companies with a system based on the corporate tax model. Tax is imposed, at regular corporate rates, on the amount of life insurance

taxable income (LICTI) for a taxable year. I.R.C. § 801. LICTI is defined as life insurance gross income reduced by life insurance company deductions. I.R.C. § 801(b). For a company with an existing PSA, the tax is imposed on the LICTI for the taxable year, not less than zero, plus "the amount of direct and indirect distributions during such year to shareholders from [the PSA]." I.R.C. § 815(a).

Since in such situations the LICTI is not reduced below zero, the amount distributed from the PSA would be taxed even if otherwise the company's losses exceeded its income. Thus, the separate taxable income required by Section 815(a) is similar in nature to the Phase III taxable income under the 1959 Act. The plain language of the current statute, however, imposes this separate tax only on PSA amounts distributed directly or indirectly to shareholders. The 1984 Act also specifically brings forward the former Section 815(f) which defined "distribution" as "any distribution in redemption of stock or in partial or complete liquidation of the corporation...." There is no support in the statutory language for applying a separate tax to amounts subtracted from a PSA under former Section 815(d), but not being directly or indirectly distributed to shareholders.

Congress adopted this language in Section 815(a) even though Congress specifically brought forward the prior Section 815(d) and clearly intended to tax PSA amounts in the same manner as they were taxed under the 1959 Act. The House Conference Report on the 1984 legislation, in setting out a description of the 1959 Act, states that "[a]mounts in the policyholders' surplus account are taxed only when distributed by the company to its shareholders." H.R.Cong.Rep. No. 861, 98th Cong., 2d Sess. 1049 (1984), *reprinted in* 1984 U.S.S.C.A.N. 1445, 1737. The report further indicates that under the 1984 legislation existing PSAs will not be taxed "unless they are treated as distributed to shareholders or subtracted from the policyholders' surplus account under rules comparable to those provided under the 1959 Act." *Id.*

Thus, the 1984 legislative history shows congressional understanding that PSA amounts were to be taxed only upon distribution to shareholders. Even though Congress specifically provided that amounts subtracted from a PSA would be taxed under rules comparable to those in effect under the 1959 Act, it defined the amount to be taxed as "the amount of direct and indirect distributions ... to shareholders" from the PSA. I.R.C. § 815(a)(2). Nowhere in the statute's language or legislative history is there any indication that Congress intended to tax (or understood the 1959 Act to have taxed) amounts subtracted from a PSA but not used for the direct or indirect benefit of shareholders.

The court is convinced that Congress never intended to tax amounts set aside in a policyholders surplus account that were earmarked to satisfy policyholder claims and would never be used for the benefit of the shareholders. The issue before the court is a narrow one and so is its holding: Upon insolvency, amounts remaining in a policyholders surplus account are subject to taxation under Section 815(a) only to the extent that such amounts will be directly or indirectly distributed to shareholders. In this case, plaintiff is not liable for any tax on the amounts remaining in those accounts upon termination of life insurance company status.

### B. Variance with Refund Claim

The Government contends that three of the arguments presented by Monat in briefing the summary judgment motions vary impermissibly with Monat's refund claims and therefore should not be considered by the court. The three Monat arguments cited by the Government are as follows:

1. Even between 1959 and 1984, amounts required to be included as income under Section 815(d)(2) could be offset against operations losses.

2. Because of the liquidations, the companies effectively became mutual companies and thus the PSA balances should not be included in income.

3. Missouri law, coupled with the Jackson County Missouri Circuit Court's setting of a bar date for filing claims, effectively precludes the Missouri subsidiary from being liable for either the Illinois subsidiary's 1988 tax or the Missouri subsidiary's 1989 tax.

In reaching its conclusion regarding the tax treatment of the PSA balances, the court did not consider the second and third arguments summarized above. As a result, the variance defense will be addressed only with respect to the first argument. The Government has asserted the variance defense with respect to the first argument only as to the 1989 tax year, since plaintiff's 1988 refund claim did not concede that pre–1984 PSA balances were included in Phase III income.

The variance defense asserted by the IRS is based on I.R.C. Section 7422(a) which provides that:

> No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary [of the Treasury], according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

Regulations provide that a claim for refund must "set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner [of Internal Revenue] of the exact basis thereof.... A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit." 26 C.F.R. § 301.6402–2(b)(1).

The purpose for the rule and regulations was explained by the Fifth Circuit as follows:

> The Commissioner should not be left to his own devices in order to discover the precise nature of a taxpayer's claim and thus be placed in a position of having to hazard a guess.... The Commissioner does not possess the time or resources to perform extensive investigations into the precise reasons and facts supporting every taxpayer's claim for refund. The need for investigation can be easily obviated by a taxpay-

er who takes the proper care in preparing his claim for refund.

*Stoller v. United States*, 444 F.2d 1391, 1393 (5th Cir.1971). The Supreme Court, in upholding the dismissal of a taxpayer's refund claim stated: "Treasury Regulations are calculated to avoid dilatory, careless, and wasteful fiscal administration by barring incomplete or confusing claims." *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 297, 65 S.Ct. 1162, 1165, 89 L.Ed. 1619 (1945).

■ In this case, the Government concedes that plaintiff's 1988 refund claim raised the issue that even under the 1959 Act no tax was imposed on a PSA balance for a company in receivership whose shareholders will receive no distribution from that account. Plaintiff claims that it did not pursue that argument in its 1989 refund claim because the IRS had already rejected the argument in response to the 1988 refund claim.

Whether plaintiff should have reaffirmed its argument in connection with the 1989 refund claim is debatable, but ultimately it is of little consequence. The IRS did not investigate the 1989 claim in isolation. In planning for this litigation, the IRS was well aware of the arguments presented in both refund claims. The issue in both claims is identical, and the plaintiff's basic argument, that PSA balances were taxable only if distributed for the benefit of shareholders, was the same for both years.

A sampling of the cases cited by the Government to support its variance argument are distinguishable from the case at bar. In those cases, the taxpayers had failed to provide IRS with any notice of the basis for their claims or later presented arguments totally unrelated to the reasons cited in their refund claims. In *Herrington v. United States*, 416 F.2d 1029 (10th Cir.1969), for example, the taxpayer claimed a refund on the basis that she had not signed a joint tax return, or if she did sign, she did so under duress. *Id.* at 1031. At trial, the plaintiff sought to assert that there was no understatement of income or fraud in the original tax returns. *Id.* at 1030–31. The court applied the "no variance" principle because the refund claim had not fairly apprised the Ser-

vice of the grounds for the claim. *Id.* at 1032.

Similarly, in *Beckwith Realty, Inc. v. United States*, 896 F.2d 860 (4th Cir.1990), the plaintiff's refund request consisted of a "mere expression of disagreement with the audit assessment." *Id.* at 863. In *Stoller v. United States*, 444 F.2d 1391 (5th Cir.1971), the basis of the plaintiff's claim was that a portion of his income rights was assigned for valuable consideration. *Id.* at 1392–93. The plaintiff's refund claim stated only: "The Commissioner of Internal Revenue erroneously determined that the taxpayers' profits from business totaled $16,935.40 in lieu of $1,859.40, which was the taxpayers' correct profit from business." *Id.* at 1393. Clearly the taxpayer failed to give any notice of the nature of his claim and no facts whatsoever to support it. In *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945), the taxpayer had filed a joint tax return with an affiliated corporation. The tax refund claim failed to provide the information requested on the appropriate claim forms and merely apportioned total amounts previously claimed between the two companies with no supporting documentation. *Id.* 294–95, 65 S.Ct. at 1163–64.

In this case, the Government was not misled about the nature of plaintiff's refund claim, and therefore suffered no prejudice. The court finds that Monat is not precluded from presenting and having the court consider its position regarding the tax treatment of PSA's during 1959–1984.

## V. Conclusion

The balances held in the policyholders surplus accounts of plaintiff's life insurance company subsidiaries are not taxable. Under both the 1959 Act and the current statute, upon termination of life insurance company status amounts held in a policyholders surplus account are taxable only if such amounts will be used to directly or indirectly benefit the company's shareholders. In this case, since the balances in these accounts will be used exclusively to pay policyholder claims, no tax should be imposed. As a result, plaintiff is entitled to a refund of federal income taxes and related additions that it paid for tax years 1988 and 1989.

Plaintiff raises several other arguments in support of its position that it had no tax liability for those years. Because of the court's holding in the case, those arguments will not be addressed. Similarly, there is no need to address the question of when interest on that tax would have begun to accrue.

Finally, the court finds that plaintiff's argument regarding the tax treatment of PSA balances under the 1959 Act does not vary impermissibly with plaintiff's 1989 refund claim.

IT IS, THEREFORE, BY THE COURT ORDERED that Monat's motion for summary judgment (Doc. 31) is granted and the motion of the United States for summary judgment (Doc. 33) is denied.

IT IS FURTHER ORDERED that plaintiff shall submit a proposed order of judgment to the court on or before November 18, 1994. Defendant shall file any objections to the proposed order on or before December 2, 1994, following which time the court shall enter its order of judgment.

Copies of this order shall be mailed to counsel of record for the parties.

IT IS SO ORDERED.