**GE LIFE AND ANNUITY CO. (Formerly the Life Insurance Company of Virginia) Plaintiff,**

v.

**UNITED STATES of America Defendant.**

**No. CIV. A. 3:00CV148.**

United States District Court, E.D. Virginia. Richmond Division.

Dec. 13, 2000.

Douglas Michael Palais, McCandlish & Kaine, Richmond, VA, Dana Johannes Finberg, McCandlish Kaine, Richmond, VA, Richard Bromley, Hopkins & Sutter, Chicago, IL, for GE Life and Annuity Assur. Co.

G. Wingate Grant, U.S. Attorney's Office, Richmond, VA, Stuart D. Gibson, U.S. Dept. of Justice, Washington, DC, Joan E. Evans, U.S. Attorney's Office, Richmond, VA, for U.S.

## MEMORANDUM

SPENCER, District Judge.

This matter is before the Court on the Parties' cross-motions for partial summary judgment. The issue presented is whether the Plaintiff's Policyholders Surplus Account was taxable in the short taxable year ended April 29, 1986.

## FACTS

The Plaintiff, GE Life and Annuity Assurance Company is a stock life insurance company domiciled in and existing under the laws of the Commonwealth of Virginia. GE Life and Annuity Company's principal place of business is located in Richmond, Virginia. At all relevant times, the Plaintiff's legal name was The Life Insurance Company of Virginia (hereinafter Life of Virginia or LOV). Virginia Life Insurance Company of New York, and American Agency Life Insurance Company were subsidiaries of Life of Virginia during the short taxable year ended April 29, 1986 (sometimes referred to as "the taxable year in issue"). In that year, all three companies were taxable as "life insurance compan[ies]" under section 801 of the Internal Revenue Code of 1954, as amended and in effect in 1986 (hereinafter referred to as "the Code"). LOV filed a consolidated federal income tax return on behalf of itself and its subsidiaries for the taxable year in issue.[1]

Between 1958 and 1983, applicable federal income tax law permitted life insurance companies to accumulate, retain and defer taxes on 50 percent of undistributed profit in "policyholders surplus accounts" (sometimes referred to as "PSAs"). Under this statutory scheme, if monies held in such PSAs were ultimately needed to provide for payments of benefits to the company's policyholders, such monies would never be subject to tax as profits of the company. However, the Code outlines three "triggering events" relevant to this case. Upon the happening of any such event all or part of a life insurance company's PSA balance became taxable income.

The Deficit Reduction Act (hereinafter "DEFRA"), effective January 1, 1984, repealed and replaced the tax laws previously applicable to life insurance companies except that DEFRA continues to recognize existing PSAs as tax-deferred until such time, if any, as the triggering events specified under pre-DEFRA law occurred.

On January 1, 1984, the PSA balances of LOV and its subsidiaries totaled $60,551,751. $59,670,151 was attributable to LOV's own PSA, $819,151 was attributable to America Agency Life Insurance Company; and $62,449 was attributable to Virginia Life Insurance Company. The taxable year in issue was the last taxable year for which Virginia Life Insurance Company of New York qualified as a life insurance company for federal income tax purposes. Consequently the $62,449 balance of its PSA was properly includible in its taxable income for the taxable year in issue.

On April 29, 1986, affiliates of Aon Corporation (hereinafter "Aon") purchased all of LOV's common stock from KMI Continental (hereinafter "KMI"), LOV's sole common stock shareholder. On January 15, 1987, LOV filed a consolidated federal income tax return for itself and its subsidiaries in which Aon, as the purchasing corporation, made a corporate stock election under section 338 of the Internal Revenue Code with respect to its purchase of LOV's common stock (hereinafter the "section 338 election"). Aon's section 338 election had the effect of causing LOV's taxable year beginning January 1, 1986 to end April 29, 1986, the day of its purchase. The $62,449 balance of Virginia Life Insurance Company of New York was included in the consolidated income reported on this January

---

1. In 1996 General Electric Capital Corporation purchased all of the stock of LOV from affiliates of Aon Corporation which had purchased all of the stock from its previous stock holder in 1986 in a transaction to be explained in detail infra. In 1998 LOV changed its legal name to GE Life Annuity and Assurance Company.

15, 1987 return [2] as were the PSA balances of both LOV and American Agency Life Insurance Company.[3] LOV paid the full $61,861,041 in taxes due on the January 15, 1987 return for the taxable year in issue.[4]

Aon's section 338 election also triggered a deemed sale of all tangible and intangible assets between fictional "Old" and "New" LOVs for federal income tax purposes. As a result of this fiction LOV incurred and paid certain "recapture" taxes and the assets generally had a tax basis in the hands of LOV equal to the assets' fair market value on April 29, 1986.

On December 23, 1993, LOV filed a timely claim with the Internal Revenue Service (hereinafter the "IRS") for a refund of taxes paid on the PSAs of LOV and American Agency Life Insurance Company. In this request for refund LOV asserted that the inclusion of the $60,489,302 total balances of these accounts in LOV's consolidated taxable income for the taxable year in issue was erroneous thereby warranting the $27,774,866 refund requested. The IRS conducted an examination of LOV's consolidated return for the taxable year in issue and proposed to disallow LOV's claim for refund relating to these accounts. During the course of this examination the IRS

refunded LOV $379,370.70 for the taxable year in issue; applied amounts previously paid for other taxable years to the taxable year in issue; and assessed LOV an additional $872,612 in taxes for the taxable year in issue. LOV also made additional payments to the agency in anticipation of additional tax and interest liability. In the end, LOV made a net payment of $29,734,-693.03 [5] for the taxable year in issue.

Eventually, the IRS examination led to a partial agreement between the two entities. The net effect of this agreement was a $10,812,564 increase in LOV's consolidated tax liability for the taxable year ended April 29, 1986 which reflected, among other things, the proposed disallowance of LOV's claim for refund relating to the PSAs of LOV and American Agency Life Insurance Company. The agreement, as set forth in an IRS Form 870–AD, reserved LOV's rights to prosecute the timely claim for refund giving rise to the investigation (hereinafter "LOV" will refer to Life Insurance Company of Virginia and American Agency Life Insurance Company).

LOV has paid a net total of $66,902,770 in federal income tax for the taxable year ended April 29, 1986 [6] and $18,049,517 in

---

2. This return was filed on Form 1120L "U.S. Life Insurance Company Income Tax Return".

3. The inclusion of LOV and American Agency Life Insurance Company PSA balances increased the amount of taxable income reported in the January 15, 1987 tax return by $60,489,302, the sum of $59,679,151 and $819,151 respectively.

4. The actual payment of the $61,861,041 breaks down as follows: $9,050,000 of estimated taxes paid on April 15, 1986; $9,050,00 of estimated taxes paid on June 15, 1986; $15,900,000 of estimated taxes paid September 15, 1986; $2,897,571 originally paid for another taxable year and applied as a credit to the taxable year in issue as of March 15, 1986; and payment of the $24,963,470 balance of the tax shown due on January 15, 1987. $6,643,447 was refunded to LOV on December 22, 1987 as a result of adjustments not relevant to this action.

5. LOV's net tax payment for the short taxable year ended April 29, 1987 is broken down below:

| Item | Amount |
|---|---|
| Amount applied from another tax year as of March 15, 1989 | $ 28,367.00 |
| Cash bond applied as of April 2, 1992 | $ 1,137,834.00 |
| Cash bonds applied as of September 11, 1995 | $ 937,569.00 |
| Payments–September 11, 1995 | $ 3,600,071.85 |
| Amounts applied from other tax years as of March 4, 1996 | $ 6,550,512.35 |
| Payment–January 20, 1998 | $17,459,709.53 |
| Refund–August 12, 1998 | ($379,370.70) |
| Total Net Payments | $29,734,693.03 |

6.

| | |
|---|---|
| Tax assessed per original return | $61,861,041 |
| Tax refunded December 22, 1987 | (872,612) |
| Tax assessed July 22, 1996 | 10,812,564 |
| Total | $66,902,770 |

assessed interest for the same period.[7] On October 8, 1998, LOV mailed the IRS a timely claim for refund asserting its entitlement to an unrelated deduction and reasserting its previous claim for refund of the taxes attributable to the PSAs of LOV. The claim asserted an entitlement to a refund of $41,636,891.[8]

### THE APPLICABLE STATUTORY SCHEME

The 86th Congress enacted Subchapter L, Part I of the Internal Revenue Code in recognition of the fact that the long term nature of insurance contracts makes it difficult, if not impossible, to determine the true income of life insurance companies by any means other than ascertaining the income derived from a contract or block of contracts over a long period of time. *See* S.Rep. No. 291, at 20–21 (1959), 1959 U.S.C.C.A.N. 1575, *reprinted in* IRS Cumulative Bulleting 1959–2 at 770, 774–775. Contained in Subchapter L is a profoundly complex set of industry specific set of rules. This pre-DEFRA tax structure established a three-phase method of taxing life insurance companies.

Phase One and Two combined to impose current basis corporate income tax on a life insurance company's profits up to its taxable investment income and if applicable 50 percent of the amount by which undistributed profits exceed taxable investment income. *See* I.R.C. § 802, 78 Stat. 11, 115 (1959) (current version at I.R.C. § 802). Where the undistributed profits of a life insurance company exceeded its taxable investment income, the untaxed 50 percent of that excess was held, tax deferred, in a PSA. *See* I.R.C. § 815, 78 Stat. 11, 130 (1959). Allowing 50 percent of a life

insurance company's apparent profit to be held in suspense was a specific congressional acknowledgment of the fact that due to the long-term nature of life insurance contracts, amounts which may appear as income in the current year and as proper additions to surplus, may as a result of subsequent events be needed to fulfill life insurance contracts. *See* S.Rep. No. 291, 1959–2 C.B. at 784.

The version of the IRS Code section that was in effect through 1983 outlined the circumstances under which the amounts held in PSAs would become taxable, which is to say the section identified several events as indicators that the funds were no longer needed to assure payments of benefits to policyholders, or that PSA balances were no longer available for that purpose because they had been distributed to the shareholder. A new version of section 815 became effective January 1, 1984, with the enactment of DEFRA. In its new form section 815 does not allow the formation of PSAs. However, the post-DEFRA section continues to recognize the tax deferred status of pre-DEFRA PSA balances pending the occurrence of a triggering event delineated in the earlier version.

### A. "Triggering Events" in Pre-DEFRA Section 815 of the Internal Revenue Code

Under section 815 taxes on amounts in PSAs are taxed upon the happening of several "triggering events", three of which are relevant to this case. "Triggering event" One is a distribution [9] to shareholders that exceeds the balance of the shareholders surplus account. In this circumstance the excess and the taxes on that

---

**7.**

| Net payments during IRS examination | $29,734,693 |
| Less: Amounts applied to tax | (872,612) |
| | (10,812,564) |
| Net amount paid as assessed interest | $18,049,517 |

**8.** $41,636,891 is the correct amount of the refund to which LOV is entitled. The refund

claimed in the IRS Form 1120S file on October 8, 1998 was mistakenly overstated as $41,665,618.

**9.** In pertinent part, the pre-DEFRA section 815(f) includes any distribution in redemption of stock or in partial or complete liquidation of the corporation in the definition of "distribution". 73 Stat 129.

excess are deducted from the balance of the PSA. *See* I.R.C. § 815, 78 Stat. 11, 130. "Triggering event" Two is a PSA balance which is exceeds statutory limitations. Under section 815 a company's PSA balance computed at the end of the taxable year must be less than the greatest of "(A) 15 percent of life insurance reserves at the end of the taxable year; (B) 25 percent of the amount by which the life insurance reserves at the end of the taxable year exceed the life insurance reserves at the end of 1958, or (C) 50 percent of the net amount of the premiums and other considerations taken into account for the taxable year under section 809(c)(1)." *Id.* In this circumstance the excess is subtracted from the PSA balance and taxed. "Triggering event" Three is the termination of either insurance or life insurance company status. When, for one or two consecutive taxable years, a company ceases to qualify as either an insurance company or a life insurance company respectively, that company's taxable investment income is increased by an amount equal to the balance remaining in the PSA at the close of the last preceding taxable year in which the company did qualify as a life insurance company. Taxes on this increase in taxable investment income are paid retroactively. I.R.C. § 815, 78 Stat. 11,130–31.

## B. SECTION 338 AND SUBSECTION (G) ELECTIONS

Section 338 addresses itself to the reality that a purchaser of all of the stock of a company may pay the higher actual value of the company's tangible and intangible assets rather than their book value. In such a situation the purchasing company would be benefitted if the acquired company could obtain a tax deduction for both the depreciation and amortization of its

tangible and intangible assets reflective of the purchase price paid to acquire its stock. This result can only be achieved if the corporation restates the tax basis of its tangible and intangible assets from their capitalized cost to their fair market value.

In 1982, Congress enacted section 338 of the Code, making the step up in tax basis just described easy to obtain. Specifically, section 338(g) allows a purchaser to make an election, in a prescribed time and manner, which causes the acquired corporation's assets to obtain a tax basis equal to their fair market value on the date of acquisition. This result is achieved through a congressionally created fiction or deemed sale of all of the acquired corporation's assets to its fictional alter ego. Section 338(a) details the particulars of this fictional transaction as follows:

> "(a) General rule.—For purposes of this subtitle, if a purchasing corporation makes an election under [subsection (g) ] . . .then in the case of any qualified stock purchase, the target corporation—
>
> > (1) shall be treated as having sold all of its assets at the close of the acquisition date at fair market value in a single transaction to which section 337 applies, and
> >
> > (2) shall be treated as a new corporation which purchased all of the assets referred to in paragraph (1) as of the beginning of the day after the acquisition date . . . . ."

Section 337 allows a corporation that has adopted a plan of complete liquidation, that is later executed, to later sell its assets without recognizing most of the gain on the sale for tax purposes.[10] Congress, by directing that the fictional transaction triggered by a section 338 election be treated as a "single transaction to which section 337 applies", insured that this

---

10. Section 337(a) provides: "If, within the 12–month period beginning on the date on which a corporation adopts a plan of complete liquidation, less assets retained to meet claims, then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12– month period." Nonetheless, section 337 is a general rule to which there are some exceptions. For example, Code section 1245(a) requires the recognitions of that amount of 'recapture' gain, equal to certain depreciation deductions previously taken, notwithstanding section 337.

deemed sale of assets would be largely tax-free to the acquired corporation.

## STANDARD OF REVIEW

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions, and affidavits presented to the court "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985). The essence of the inquiry that the court must make is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The United States Supreme Court has established that the party moving for summary judgment bears the burden of establishing both the absence of genuine issues of material fact and entitlement to judgment as a matter of law.[11] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The parties do not dispute any of the material facts. They agree that the sale of common stock and the section 338 election occurred. They also agree that a "deemed" sale of assets from a fictional "Old" LOV to its alter ego "New" LOV is the consequence of Aon's § 338 election. Therefore, this matter indeed presents a purely legal question and is appropriate for summary judgment.

## DISCUSSION

IS A SECTION 338 ELECTION BY A PURCHASER OF COMMON STOCK IN A LIFE INSURANCE COMPANY A TRIGGERING EVENT UNDER SECTION 815(D) OF THE INTERNAL REVENUE CODE?

In enacting the Life Insurance Company Tax Act of 1959 and DEFRA Congress was attempting to address the special characteristics of life insurance risks and the difficulty in determining the actual annual income of life insurance companies. The 1959 Act specifically created tax deferred PSAs to provide a cushion for the eventuality of contract liability to policyholders in excess of income. However, in so doing Congress was careful to define the "triggering events" that would result in taxation on monies held in such accounts. In fact, the Senate specifically stated that when certain "triggering events" occur "it becomes clear that the company itself has made the determination that additional amounts constitute income which was not required to be retained to fulfill the policyholder's contracts." Sen. Rep. No. 291, 86th Cong., 1st Sess. 20–21, *reprinted in* 1959–2 C.B. 778.

Congressional intention in enacting section 338 was to treat a target corporation as "new" after the acquisition date for the limited purpose of determining the tax basis of assets in the hands of the purchasing corporation. The cross reference to section 337 does not function to read a "liquidating distribution" into section 338 but rather supplies the tax treatment, non-recognition of gain or loss by the target company, intended for that company after the section 338 election by the purchaser. Indeed, where Congress intended a deemed distribution or a deemed liquidation it explicitly said so. Relevant Treasury Regulations are instructive on this point in that they "purport to create such a deemed distribution to a shareholder only in the case of a special election (not relevant to LOV) that is made jointly by the purchaser and the selling shareholder under Code section 338(h)(10)." *See* Tres. Reg. 1.338(h)(10)–1T, –1T(e)(3).

Section 338 only provides for a deemed asset sale. Accordingly, under section 338

---

**11.** In a June 27, 2000 pretrial conference before this Court the parties informed the Court of their agreement that the PSA issue is one of law presenting no genuine issue of material fact thus making it appropriate for resolution on motions for summary judgment.

there is a single fictional transaction between the selling corporation and a real (or fictional) purchaser in which the seller is said to receive or be deemed to receive consideration from the purchaser in the form of money or other property for assets. A sale of corporate assets to a third party therefore is not a "distribution" to shareholders. Nor does such an asset sale, if one occurs, occur "in" a distribution to shareholders.

After the enactment of DEFRA Congress intended for PSA balances to be taxable "to the extent of 'direct and indirect distributions...to shareholders.'" Moreover, the term "distribution" is intended to include actual, deemed and indirect use of PSA balances for the benefit of shareholders. *See* H.R.Rep. No. 861, 98th Cong., 2d Sess. 1050 (1984). LOV made no actual distribution of assets for the benefit of shareholders. In fact, there was neither a deemed distribution from LOV nor an indirect use of PSA balances for the benefit of LOV shareholders. Id.

■ The "hallmark of a constructive distribution is value passing from, or a sufficiently specific economic benefit conferred by, the corporation to the shareholder, for which the shareholder does not give equivalent value in exchange." In other words, a constructive distribution is one in which a corporation confers specific benefits on a shareholder by directing corporate property or services to the shareholder or the shareholder's creditor or other designates, without fair value in exchange. *See* Bittker and Eustice, *Federal Income taxation of Corporations and Shareholders* (Sixth Ed.1998) at 8–37. Thus, a distribution can only be said to indirectly benefit shareholders when the benefit is more than the strictly derivative interest a shareholder has in any corporate transaction.

The alternate conclusion urged on this Court by the United States is predicated on the existence of a "stock-purchase merger." No merger took place between KMI, Aon or LOV because there was no transfer of liabilities to a surviving company nor did any company cease to exist. In fact, LOV continued to exist as before and its obligations to policyholders were unchanged both in nature and amount. Moreover, LOV maintained the same corporate form and filed taxes as consolidated life insurance companies both before and after Aon's 1986 purchase of LOV common stock.

Lastly, section 338 provides that one corporation—'the target corporation'—is treated as if it both sold, and then purchased, the same assets. Nowhere does the statute require that the target corporation be considered to have terminated its existence or changed the nature of its operations after the deemed sale and repurchase of its assets.

## CONCLUSION

The question presented here for this Court's resolution is whether a section 338 election by a purchaser of common stock in a life insurance company is a triggering event under section 815(d) of the Internal Revenue Code?

Under section 815 taxes on all or part of a life insurance company's PSA are only triggered by either distributions to shareholders which exceed the balance of shareholders surplus accounts; or PSA balances in excess of statutory maximums; or the company's failure to qualify as an insurance or life insurance company for one or two years respectively. KMI's sale of common stock to Aon was not an actual or constructive distribution by LOV. Therefore, it is immaterial whether the purchase price exceeded the balance of LOV's shareholder surplus account. The sole purpose of a section 338 election is to allow a step-up in the tax basis of a target company's assets to reflect the price paid for the stock by a stock purchaser. Moreover, the sole purpose of the section 338 cross reference to section 337 is to direct the method of taxing the deemed asset sale directed by the section.

■ Finally, in this case, no actual merger took place causing LOV to cease to exist and under this Court's reading of sections 337 and 338 no deemed merger took place either. This reading of the statute leads to the conclusion that LOV continued to exist and continued to operate as a life insurance company following both Aon's stock purchase and its section 338 election. The obligations of the company did not change thus Congressional concern over unique risks were still pertinent to the company. Therefore, this Court concludes that LOV continued to exist as a life insurance company and that a section 338 election by a third party purchaser does not result in a distribution under section 815.

. Accordingly, the United States' Motion for Partial Summary Judgment is hereby DENIED and GE Life's Motion for Partial Summary Judgment is GRANTED.

And it is SO ORDERED.