**John A. GREENE, Receiver for the Great Global Assurance Company, in Liquidation, Plaintiff,**

v.

**UNITED STATES, Defendant.**

**No. 96–169T.**

United States Court of Federal Claims.

Oct. 7, 2004.

Douglas J. Schmidt, Kathryn B. Bussing, Blackwell Sanders Peper Martin LLP, Kansas City, Missouri, for the plaintiff.

Mary M. Abate, Tax Division, Mildred L. Seidman, Chief, Court of Federal Claims Section; and Eileen J. O'Connor, Assistant Attorney General, United States Department of Justice, Washington, D.C., for the defendant.

## OPINION

HORN, Judge.

This case arises out of a dispute concerning a tax refund allegedly owed by the United States to the Great Global Assurance Company (Great Global). The plaintiff, John A. Greene,[1] Receiver for the Great Global Assurance Company, a life insurance company, alleges that the defendant, the United States, acting through the Department of the Treasury, Internal Revenue Service (IRS), erroneously withheld a tax refund due to Great Global. The plaintiff seeks relief in the amount of $699,849.00 plus interest, costs, attorney's fees, and such other costs as the court deems proper.

In an earlier decision, this court dismissed plaintiff's complaint, holding that Great Global failed to file its refund claim with the Internal Revenue Service within the required statutory period. *See Green v. United States*, 42 Fed.Cl. 18 (1998). The Federal Circuit reversed and remanded the case, holding that the plaintiff filed its claim within the three-year statute of limitations provided by 26 U.S.C. § 6511. *See Greene v. United States*, 191 F.3d 1341 (Fed.Cir.1999). The decision below addresses the parties' cross-motions for summary judgment, filed by the parties pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC).

## BACKGROUND

Before 1959, life insurance companies were taxed only on that portion of their investment income which was in excess of the

---

1. Originally, the Receiver for Great Global was Chris Herstam. The position of Receiver is allocated to the Director of the Arizona Department of Insurance. Accordingly, because the person in this position has changed, so has the party acting as Receiver for Great Global. As of this date, the case is captioned in the name of Receiver, John A. Greene.

funds reserved to satisfy their obligations to policyholders. In 1959, Congress enacted tax legislation applicable to life insurance companies which attempted to measure the total income of a life insurance company, rather than just its investment income. Due to the difficulties in calculating the true annual income of a life insurance company, the Life Insurance Company Income Tax Act of 1959 (the 1959 Tax Act), Pub.L. No. 86–169, 73 Stat. 112 (codified as amended at 26 U.S.C. § 801–20), introduced a three-phase procedure for taxing life insurance companies.[2] The 1959 Tax Act allowed insurance companies to shelter a portion of their income to enable insurers to build sufficient reserves. This tax sheltered money was to be placed in a "policyholders surplus account" designed to contain enough money to satisfy the insurance company's obligations to policyholders. The income taxed under Phase I of the three-phase tax procedure includes "the portion of the net income from interest, dividends, rents, royalties and other investment sources which is in excess of the amount required as interest additions to reserves or as interest paid." H.R.Rep. No. 34, 86th Cong., 1st Sess. 15 (1959), 1959–2 C.B. 736, 741.

The Phase II portion of the tax base is calculated at 50 percent of the excess of total net income from all sources over the taxable investment income. This is referred to as an underwriting gain and represents "mortality and loading savings, or savings resulting from longer life expectancies than assumed in establishing premiums and reserves, and also savings from reductions in expenses of servicing policies and expenses incurred in 'putting policies on the books.'" *Id.* The 50

percent untaxed portion of the underwriting gain is placed in a policyholders surplus account. The Phase III portion of the tax base was designed to assure that amounts previously deferred under Phase II were added to the tax base and, therefore, subject to taxation when they were no longer used to comply with the insurance company's obligations to policyholders. The Phase III tax "is designed to give assurance that underwriting gains made available to shareholders will be subject to the full payment of tax. Thus, this phase is concerned with the half of underwriting income which under Phase II is not added to the tax base." *Id.* The Phase III tax liability for that amount of money, which life insurance companies previously excluded from the tax base, is triggered by one of several events, including the failure of an insurance company to qualify for two successive years as a "life insurance company" pursuant to the statutory definition included in 26 U.S.C. § 801(a) (1982). *See* 26 U.S.C. § 815(d)(2)(A)(ii) (1982).[3]

## FINDINGS OF FACT [4]

The plaintiff, Great Global Assurance Company, has its principal place of business in Scottsdale, Arizona. Great Global requested an extension of time until September 17, 1984 to file its 1983 tax return. Great Global filed a federal Life Insurance Company Income Tax Return, Form 1120L, for tax year 1983, on September 17, 1984. On that tax return, Great Global reflected zero tax liability for tax year 1983.[5]

During the following two tax years, 1984 and 1985, Great Global failed to qualify as an insurance company.[6] Therefore, Great Glob-

---

2. The Deficit Reduction Act of 1984, Pub.L. No. 98–369, 98 Stat. 494, further changed the way life insurance companies were taxed. Division A of the Deficit Reduction Act is known as the Tax Reform Act of 1984, which, at section 211, 98 Stat. 720, addressed the taxation of life insurance companies (codified at 26 U.S.C. § 801 *et seq.*). However, 26 U.S.C. § 815(f) (1982 & Supp. III 1985) directs that the previous version of the code be applied to policyholders surplus accounts for which there was a balance as of December 31, 1983.

3. For further descriptions of Phases I, II, and III, *see* S.Rep. No. 291, 86th Cong., 1st Sess., reprinted in 1959 U.S.C.C.A.N. 1575–1615.

4. The court incorporates the findings of fact included in its earlier opinion, which are summarized in this opinion and expanded upon based on more recent filings by the parties following the remand.

5. Great Global reported income from operations of $2,770,918.00 and deductions attributable to operations of $2,828,834.00. This net loss caused the calculation of a zero tax liability.

6. Although neither party has indicated the reasons for the failure to qualify, both parties agree that Great Global did not qualify as an insurance company during the tax years 1984 and 1985.

al became liable to the IRS for taxes on the money in the policyholders surplus account (PSA), and was required to add the amount remaining in the PSA to its taxable income for the last preceding tax year in which it had qualified as an insurance company. In this case, Great Global had qualified as an insurance company in tax year 1983, but had not qualified in 1984 or 1985.[7] As a result, Great Global filed an amended 1983 return on July 9, 1990, which included in the tax base funds held in the PSA.

The Maricopa County Superior Court of Arizona ruled on February 7, 1986 that Great Global was insolvent, placed the company in receivership and appointed the Director of the Arizona Department of insurance as the Receiver. Subsequently, the Receiver's efforts to rehabilitate Great Global failed. Thereafter, on June 8, 1988, the Maricopa County, Arizona Superior Court directed the Receiver to liquidate any remaining assets of Great Global.

The Receiver filed an amended return on behalf of Great Global on July 9, 1990, and paid $699,849.00 to the IRS. The amount paid consisted of $357,392.00 in revised tax liability and interest thereon of $342,457.00. This increased tax liability resulted from the addition of $820,961.00 to Great Global's 1983 income base from funds previously held in the PSA. Approximately three months later, on September 24, 1990, the IRS assessed the additional tax and interest on Great Global pursuant to 26 U.S.C. § 6501(c)(6) (1982).[8]

On July 8, 1993, Great Global filed a second amended tax return for the tax year 1983 and requested a refund of the $699,849.00, including taxes and interest pursuant to 26 U.S.C. § 6402(a) (1982).[9] In its claim for a refund, Great Global stated that:

1. Under Arizona law for the relevant period, which is binding on Great Global and the IRS because of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), the Taxpayer's Receivership has insufficient funds to satisfy claims of policyholders, whose priority to payment in the Receivership is senior to the claim of the IRS.

2. No Phase III tax is applicable in a receivership where shareholders receive nothing, since such tax "is designed to give assurance that underwriting gains made available to shareholders will be subject to the full payment of tax." H.R.Rep. No. 34, 86th Cong., 1st Sess. 15 (1959), 1959–2 C.B. 736, 741, 742.

The IRS District Director, Mark Cox, responded by letter dated March 1, 1995, and

---

The requirements for qualifying as an insurance company for tax purposes are set forth at 26 U.S.C. § 801(a) (1982).

7. The terms of 26 U.S.C. § 815(d)(2)(A) (1982) provide:

   (2) Termination as life insurance company
   (A) Effect of termination
   Except as provided in section 381(c)(22)(relating to carryovers in certain corporate readjustments), if—
   (i) for any taxable year the taxpayer is not an insurance company, or
   (ii) for any two successive taxable years the taxpayer is not a life insurance company, then the amount taken into account under section 802(b)(3) for the last preceding taxable year for which it was a life insurance company shall be increased (after the application of subparagraph (B)) by the amount remaining in its policyholders surplus accountant the close of such last preceding taxable year.

8. 26 U.S.C. § 6501(c)(6) was in effect prior to 1984 and is made applicable to the time period at issue by 26 U.S.C. § 815(f). Section (c)(6) stated:

(6) Tax resulting from certain distributions or from termination as a life insurance company. In the case of any tax imposed under section 802(b)(3) on account of termination of the taxpayer as an insurance company or as a life insurance company to which section 815(d)(2)(A) applies, or on account of a distribution by the taxpayer to which section 815(d)(2)(B) applies, such tax may be assessed within three years after the return was filed (whether or not such return was filed on or after the date prescribed) for the taxable year for which the taxpayer ceases to be an insurance company, the second taxable year for which the taxpayer is not a life insurance company, or the taxable year in which the distribution is actually made as the case may be.

9. 26 U.S.C. § 6402(a) reads:

   (a) General Rule—In the case of any overpayment, the Secretary, within the applicable period of limitations, may credit the amount of such overpayment, including any interest allowed thereon, against any liability in respect of an internal revenue tax on the part of the person who made the overpayment and shall, subject to subsections (c) and (d), refund any balance to such person.

denied the claim for the refund on two counts. The IRS concluded that Great Global had not timely filed the refund claim and that, even if the claim had been timely, it would have been denied because a partial or complete liquidation of an insurance company is one of the events that trigger Phase III tax liability pursuant to 26 U.S.C. § 815(d)(2)(A). Thereafter, the taxpayer filed a supplemental claim dated March 7, 1995, and a protest, dated March 23, 1995, which requested that the appeals office consider the claim.

The IRS appeals officer, George Lawrence, notified Great Global that it should resubmit its claim and explain its position on the timeliness issue. Great Global responded to the IRS with its resubmitted claim and its taxpayer's position contending that the claim was timely. The appeals office rejected Great Global's argument and disallowed the claim on the ground that it was not timely.

Thereafter, Great Global filed the above-captioned complaint. The government moved to dismiss on grounds that this court lacked subject matter jurisdiction pursuant to RCFC 12(b)(1) and on grounds that Great Global failed to state a claim upon which relief can be granted pursuant to RCFC 12(b)(4). The government predicated its position regarding the court's subject matter jurisdiction on the applicable three-year statute of limitations in tax refund cases provided by 26 U.S.C. § 6511(a) (1982). The government contended that Great Global filed its tax return for tax year 1983 on September 17, 1984, thus commencing the time from which to calculate the three-year statute of limitation.

According to the government, the three-year statute of limitations ended on September 17, 1987. Moreover; according to the government, Great Global filed the amended return with the tax payment on July 9, 1990, thus commencing the running of the applicable two-year statute of limitations, pursuant to 26 U.S.C. § 6511(a), which ended on July 9, 1992. Therefore, the defendant argued that the two-year statute of limitations ex-

pired nearly a year before plaintiff filed its refund claim on July 8, 1993. In addition, defendant contended that plaintiff's actions should be dismissed pursuant to RCFC 12(b)(4) because any allowable refund necessarily would be limited to zero under 26 U.S.C. § 6511(b)(2)(B) (1986).[10]

Plaintiff contended that the 1984 filing for the 1983 tax year could not have triggered the starting date for computation of the statute of limitations because the facts necessary to ascertain the Phase III tax liability had not been determined at that time and subsequent events necessary to compute the tax had not yet occurred. According to the plaintiff, Great Global did not become liable for the Phase III tax until January 1, 1986, after it failed to qualify as a life insurance company for two consecutive years (1984–85). Great Global argued that the July 9, 1990 amended return was the operative return with respect to calculating the statute of limitation on the Phase III tax in dispute and, therefore, that the statute of limitations did not expire for three years, or until July 9, 1993, one day after plaintiff filed its claim with the IRS for the tax refund at issue.

After briefing by the parties, this court held in favor of the government on the ground that the court lacked subject matter jurisdiction. *See Green v. United States,* 42 Fed.Cl. at 30. The court found that the three-year statute of limitations provided by 26 U.S.C. § 6511(a) (1982) began to run on September 17, 1984, the date that Great Global filed its tax return for the 1983 tax year. *See id.* at 28–29. Thus, the court found that the applicable statute of limitations expired on September 17, 1987. *See id.* The court further found that the two-year statute of limitations from the date of payment began to run on July 9, 1990, the date that Great Global filed its second amended return for the 1983 tax year with the accompanying tax payment. *See id.* The court found that the three-year statute of limitations from the date of filing and the two-year statute of limitations from the date of payment expired, respectively, almost six years

---

**10.** The provisions of 26 U.S.C. § 6511(b)(2)(B) state: "[i]f the claim was not filed within such 3–year period, the amount of the credit or refund shall not exceed the portion of the tax paid during the 2 years immediately preceding the filing of the claim."

and approximately one year before Great Global filed its refund claim with the IRS. *See id.* Great Global appealed.

The United States Court of Appeals for the Federal Circuit reversed and remanded. The Federal Circuit reasoned:

> In this case, where the events giving rise to the tax necessarily took place after the taxable year, the return that starts the running of the statute is the return in which the taxpayer is required to or does report the income. Here, both parties concede that the Phase III income was not required to be reported on GGAC's 1983 tax return; in fact, it could not be so reported because GGAC's liability had not been established at the time of the filing of that return. Therefore, contrary to the conclusion of the Court of Federal Claims, the 1983 return cannot be the return that starts the running of the three-year limitations period. Because there apparently was no date on which the return showing the Phase III income was required to be filed, and hence no other such return was filed, the 1990 amended return is the only return that could have started the running of the limitations period. It reported the "overpayment of [the] tax in respect of which tax [the] taxpayer [was] required to file [the] return."

*Greene v. United States*, 191 F.3d at 1343 (quoting 26 U.S.C. § 6511(a) (1994) (alterations in original)). The appellate court found that the plaintiff's refund action was not time barred and that jurisdiction regarding plaintiff's complaint was properly lodged and remanded the case to the trial court.

Following the remand, in its motion for summary judgment, the plaintiff argues that under the McCarran–Ferguson Act, 15 U.S.C. § 1012(b) (1982), Arizona law, in particular, Arizona Revised Statutes § 20–629 (1997), which it applies retroactively as applicable to the relevant time period, takes priority over the federal priority statute. The Arizona statute cited by plaintiff requires that policyholders' claims and claims by guarantee funds are senior to claims of the Internal Revenue Service. From this, plaintiff concludes that the government must refund the disputed tax payment because the

money appropriately should be used to satisfy Great Global's outstanding policyholders' claims.

In its cross-motion for summary judgment, the government argues that Phase III tax liability for the 1983 tax year was triggered when Great Global failed to qualify as a life insurance company for two consecutive years. The government states that the Receiver's payment of the tax and interest does not qualify as an overpayment. Therefore, according to the defendant, the plaintiff properly satisfied its tax liability with the 1990 payment and is owed no refund. The government also contends that it is immaterial under 26 U.S.C. § 815(d)(2)(A)(ii) whether Great Global would use the refund to satisfy claims of policyholders as opposed to shareholders' claims.

### DISCUSSION

The parties have filed cross-motions for summary judgment on the plaintiff's complaint pursuant to RCFC 56. RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States,* 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. United States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507 (Fed.Cir.2002); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> [S]aves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir. 1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l. Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material

fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the non-moving party must go beyond the pleadings by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied,* 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.,* 401 F.2d 689, 692 (4th Cir.1968), *cert. denied,* 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138,

1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.,* 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States,* 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.,* 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.,* 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002).

In the instant case, the parties claim that there are no material issues of fact in dispute. Moreover, the court has found no disputed material issue of fact. Therefore, the court's analysis begins with the plain language of the statute. *See Duncan v. Walker,* 533 U.S. 167, 172, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001) ("Our task is to construe what Congress has enacted. We begin, as always, with the language of the statute."); *Carter v. United States,* 530 U.S. 255, 257, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000) ("[T]he Court's inquiry begins with the textual product of Congress' efforts, not with speculation as to the internal thought processes of its Members."). In interpreting the plain meaning of the statute, it is the court's duty, if possible, to give meaning to every clause and word of the statute. *See Duncan v. Walker,* 533 U.S. at 173, 121 S.Ct. 2120; *Williams v. Taylor,* 529 U.S. 362, 404, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (describing as a "cardinal principle of statutory construction" the rule that every clause and word of a statute must be given effect if possible). Similarly, the court must avoid an interpretation of a clause or word which renders other provisions of the statute inconsistent, meaningless, or superfluous. *See Duncan v. Walker,* 533 U.S. at 167, 121 S.Ct. 2120 (noting that courts should not treat statutory terms as "surplusage"). " '[W]hen two statutes are capable of co-existence ... it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.' " *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer,* 515 U.S. 528, 533, 115 S.Ct. 2322, 132 L.Ed.2d 462 (1995) (quoting *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)); *see also Hanlin v. United States,*

214 F.3d 1319, 1321 (Fed.Cir.), *reh'g denied* (2000).

A court must not stray from the statutory definition of a term. *See Stenberg v. Carhart,* 530 U.S. 914, 942, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Meese v. Keene,* 481 U.S. 465, 484–485, 107 S.Ct. 1862, 95 L.Ed.2d 415 (1987); *Colautti v. Franklin,* 439 U.S. 379, 392 n. 10, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979). "It is axiomatic that the statutory definition of the term excludes unstated meanings of that term." *Meese v. Keene,* 481 U.S. at 484–85, 107 S.Ct. 1862. As the United States Court of Appeals for the Federal Circuit stated in *AK Steel Corporation:*

> When Congress makes such a clear statement as to how categories are to be defined and distinguished, neither the agency nor the courts are permitted to substitute their own definition for that of Congress, regardless of how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better.

*AK Steel Corp. v. United States,* 226 F.3d 1361, 1372 (Fed.Cir.2000). When a word is undefined, courts regularly give that term its ordinary meaning. *Asgrow Seed Co. v. Winterboer,* 513 U.S. 179, 187, 115 S.Ct. 788, 130 L.Ed.2d 682 (1995); *AK Steel Corp. v. United States,* 226 F.3d at 1371.

A singular term may not be read in isolation, however. *See Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 852, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001) (citing *Gade v. Nat'l Solid Wastes Mgmt. Assn.,* 505 U.S. 88, 99, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992)). The "meaning of a provision is 'clarified by the remainder of the statutory scheme ....'" *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 217, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (quoting *United Sav. Assn. of Tex. v. Timbers of Inwood Forest Assocs., Ltd.,* 484 U.S. 365, 371, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988) and describing statutory construction as a "holistic endeavor"). "Words are not pebbles in alien juxtaposition; they have only a communal existence; and not only does the meaning of each interpenetrate the other, but all in their aggregate take their purport from the setting in which they are used." *King v.*

*Saint Vincent's Hosp.,* 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991) (quoting *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941) (L.Hand, J.)).

When the statute provides a clear answer, the court's analysis is at an end. *Harris Trust and Sav. Bank v. Salomon Smith Barney, Inc.,* 530 U.S. 238, 254, 120 S.Ct. 2180, 147 L.Ed.2d 187 (2000) (quoting *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999)). Thus, when the " 'statute's language is plain, "the sole function of the courts is to enforce it according to its terms." ' " *Johnson v. United States,* 529 U.S. 694, 723, 120 S.Ct. 1795, 146 L.Ed.2d 727 (2000) (quoting *United States v. Ron Pair Enterps., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (quoting *Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917))). In such an instance, the court will not consider "conflicting agency pronouncements" or "extrinsic evidence of a contrary intent." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d 388, 391 (Fed.Cir.1994) (citing *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (noting that courts must not defer to agency interpretation contrary to the intent of Congress evidenced by unambiguous language) and *Darby v. Cisneros,* 509 U.S. 137, 147, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)). "[O]nly language that meets the constitutional requirements of bicameralism and presentment has true legal authority." *Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391 (citing *INS v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983)). " '[C]ourts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States,* 512 U.S. 573, 583–84, 114 S.Ct. 2419, 129 L.Ed.2d 459 (1994) (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d 697, 712 (D.C.Cir.1987)). Consequently, if a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 119, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (citing

*Ratzlaf v. United States,* 510 U.S. 135, 147–148, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.")). There are select instances when resort to legislative history is proper. For example, a court may consider legislative history if:

the plain meaning produces a result that is not just "harsh," *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 576, 102 S.Ct. 3245, 3252, 73 L.Ed.2d 973 (1982), "curious," *Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 172, 98 S.Ct. 2279, 2291, 57 L.Ed.2d 117 (1978), or even "stark and troubling," *Estate of Cowart,* 505 U.S. at [483], 112 S.Ct. at 259[8], but "so bizarre that Congress 'could not have intended' it," *Demarest v. Manspeaker,* 498 U.S. 184, 186, 190–91, 111 S.Ct. 599, 601–02, 603–04, 112 L.Ed.2d 608 (1991).

*Weddel v. Sec'y of Dep't of Health and Human Servs.,* 23 F.3d at 391. Moreover, legislative history may be introduced into the analysis to resolve an ambiguous statute. *Ratzlaf v. United States,* 510 U.S. at 148 n. 18, 114 S.Ct. 655 (citing *Barnhill v. Johnson,* 503 U.S. 393, 401, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)); *Patterson v. Shumate,* 504 U.S. 753, 761, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992).

■ "If legislative history is to be considered, it is preferable to consult the documents prepared by Congress when deliberating." *Gustafson v. Alloyd Co.,* 513 U.S. 561, 580, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). "[T]he authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.'" *Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984) (quoting *Zuber v. Allen,* 396 U.S. 168, 186, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969)). "'[T]he fears and doubts of the opposition are no authoritative guide to the construction of legislation'" because of the likelihood that those in opposition tend to overstate the reach of the bill in question. *Bryan v. United States,* 524 U.S. 184, 196, 118 S.Ct. 1939, 141 L.Ed.2d 197 (1998) (quoting *Schwegmann Bros. v. Calvert*

*Distillers Corp.,* 341 U.S. 384, 394, 71 S.Ct. 745, 95 L.Ed. 1035 (1951)). Moreover, statements by individual legislators should not be given controlling weight, although such statements may evidence congressional intent when consistent with statutory language and other pieces of legislative history. *Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (citing *Grove City Coll. v. Bell,* 465 U.S. 555, 567, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)).

"'[S]ubsequent history is less illuminating than the contemporaneous evidence.'" *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs,* 531 U.S. 159, 170, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001) (quoting *Hagen v. Utah,* 510 U.S. 399, 420, 114 S.Ct. 958, 127 L.Ed.2d 252, *reh'g denied* (1994)); *see also United States v. X-Citement Video, Inc.,* 513 U.S. 64, 77 n. 6, 115 S.Ct. 464, 130 L.Ed.2d 372 (1994) ("[T]he views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight ... and the views of the committee of one House of another Congress are of even less weight."). *But cf. Loving v. United States,* 517 U.S. 748, 770, 116 S.Ct. 1737, 135 L.Ed.2d 36 (1996) ("" 'Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.'"") (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 118 n. 13, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) (quoting *Red Lion Broad. Co. v. FCC,* 395 U.S. 367, 380–81, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969))).

Although the Court in *Loving* cited the *Consumer Product Safety Commission* decision for the proposition that subsequent legislation may be used to interpret an earlier statute, the Court in *Consumer Product Safety Commission* adhered to the principle that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. at 118, 100 S.Ct. 2051. It cited the proposition regarding reliance on subsequent legislation only for the purpose of declining to adopt it, stating that "even when it would otherwise be useful, subsequent legislative

history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment." *Id.* at 118 n. 13, 100 S.Ct. 2051.

In this regard, a court should give little weight to attempts to infer congressional intent to adopt judicial interpretations of a statutory provision when Congress revises the statutory scheme but fails to amend the provision in question. *See Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 652, 148 L.Ed.2d 556 (2000). Similarly, " 'failed legislative proposals are "a particularly dangerous ground on which to rest an interpretation of a prior statute." ' " *Solid Waste Agency of N. Cook County v. United States Army Corps of Eng'rs*, 531 U.S. at 170 (quoting *Cent Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579, (1990))).

### A. Phase III Tax Liability as Applied to PSA Accounts

■ The plain language of the statutory sections which impose Phase III tax liability are contained in 26 U.S.C. §§ 802 and 815 (1982). Section 802(b)(3) states: "For purposes of this part, the term 'life insurance company taxable income' means the sum of . . . the amount subtracted from the policyholders surplus account for the taxable year, as determined under section 815." 26 U.S.C. § 802(b)(3). Section 815(d)(2)(A)[11] states:

Except as provided in section 381(c)(22) (relating to carryovers in certain corporate readjustments), if . . . (ii) for any two successive taxable years the taxpayer is not a life insurance company, then the amount taken into account under section 802(b)(3) for the last preceding taxable year for which it was a life insurance company shall be increased (after the application of subparagraph (B)) by the amount remaining in

11. Section 815(d)(2)(A) of the Act is also referred to in the case law discussion as the 1959 Act.

12. A policyholders surplus account is defined in the immediately preceding subsection, 26 U.S.C. § 815(c). In relevant part, section 815(c) pro-

its policy holders surplus account[12] at the close of such last preceding taxable year. 26 U.S.C. § 815(d)(2)(A). Thus, section 815(d) describes several events that trigger Phase III tax liability, thereby ending the tax deferred status of money previously held in the PSA. The relevant triggering event in this case is the failure of an entity previously qualified as a life insurance company to qualify as a life insurance company for two consecutive years, as described in section 815(d)(2)(A)(ii). Other events, described in section 815(d)(2)(B), however, may trigger Phase III tax liability, as discussed below.

In sum, section 815(d)(2)(A)(ii) requires a former life insurance company to "subtract" the full balance of its PSA and include the amount subtracted as taxable income in the last year in which the company qualified as a life insurance company. This subtraction reduces the PSA to zero and triggers the taxation of the full balance under section 802(b)(3), which defines "life insurance company taxable income" as the amount subtracted from the PSA for the taxable year. The PSA's balance must then be calculated, however, "after the application of subparagraph (B) [of 26 U.S.C. § 815(d)(2) ]," which addresses, separately, distributions made to shareholders. 26 U.S.C. § 815(d)(2)(A)(ii).

Section 815(d)(2)(B) provides that "[i]f for any taxable year the taxpayer is an insurance company but not a life insurance company, then any distribution to shareholders during such taxable year shall be treated as made on the last day of the last preceding taxable year for which the taxpayer was a life insurance company." When applied, the plain meaning of sections 815(d)(2)(A)(ii) and 815(d)(2)(B) require that an insurance company first treat any distributions made to shareholders as if they were made on the last day the company qualified as a life insurance company. Then, after any distributions to shareholders are taken into account, the company's taxable income is increased by whatever amount remains in its PSA. Thus, by its

vides that life insurance companies shall "establish and maintain" a PSA, and defines what additions and subtractions should be made from a PSA.

plain meaning, even if an insurance company makes no distributions to shareholders, as identified under section 815(d)(2)(B), the company must increase its taxable income by the amount remaining in its PSA when it fails to qualify as a life insurance company for two successive years.

The government argues that the plain language of sections 802(b)(3) and 815(d)(2)(A)(ii) require that, with the one (not applicable) enumerated exception for carryovers, an entity that fails to qualify as a life insurance company for two consecutive years must "subtract" from the PSA the full balance of the PSA, rendering it taxable. The defendant argues that this subtraction, and consequential taxation, exists independent of, and in addition to any distributions made to shareholders or policyholders. Moreover, the government contends that there is no ambiguity in the language of either of these provisions.

Plaintiff argues that an exception to Phase III taxation exists for amounts in PSAs intended to be paid to policyholders, thus preventing those amounts from being taxed. However, section 815 does not contain an exception for insolvent life insurance companies that would use PSA funds to pay policyholders' claims. Section 815 contains only a single exception, "as provided in [26 U.S.C. § 381(c)(22)] (relating to carryovers in certain corporate readjustments)." 26 U.S.C. § 815(d)(2)(A). That Congress included an exception related to carryovers in certain corporate readjustments allows the court to infer that Congress intended to exclude other exceptions. *See United States v. Johnson,* 529 U.S. 53, 58, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000) ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference, and the one we adopt here, is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth."). Contrary to plaintiff's contentions, the court finds no ambiguity in the language of section 815(d)(2)(A)(ii). Instead, the court agrees with the government that the statute's plain language requires that an insurance company's failure to qualify as a life insurance company for two

years renders its entire PSA balance taxable as income for the last year in which the company qualified as a life insurance company.

Plaintiff, in its brief supporting its motion for summary judgment, does not identify what portion of the statute it considers to be the source of the ambiguity. The extent of plaintiff's identification in that brief of the alleged ambiguity is a subheading which summarily concludes that "[t]he 1959 Act's Language is Ambiguous and Requires Reference to the Legislative History." Furthermore, in its brief in opposition to defendant's motion for summary judgment, plaintiff summarily cites the title of section 815, "distributions to shareholders," as the source of the ambiguity, giving no further explanation as to how the title renders the language of the statutory section ambiguous. The only support that plaintiff offers for its conclusion regarding ambiguity, and seemingly the only case law addressing plaintiff's argument, is a citation to a non-precedential United States District Court case, *Monat Capital Corporation v. United States,* 869 F.Supp. 1513 (D.Kan.1994) and reference to another non-precedential United States District Court case, *GE Life & Annuity Company v. United States,* 127 F.Supp.2d 794 (E.D.Va.2000), *judgment modified,* 89 A.F.T.R.2d 2002–1815 (E.D.Va. Mar.25, 2002).

In *GE Life,* the court was asked to determine whether a corporate stock election under 26 U.S.C. § 338 triggered Phase III tax liability under 26 U.S.C. § 815(d). *See GE Life & Annuity Co. v. United States,* 127 F.Supp.2d at 800. Whether or not a company that fails to qualify as an insurance company for two years should be taxed on the balance of its PSA was not at issue in the *GE Life* case. However, plaintiff quotes the proposition in *GE Life* that states, "if monies held in such PSAs were ultimately needed to provide for payments of benefits to the company's policyholders, such monies would never be subject to tax as profits of the company." *Id.* at 795. Plaintiff does not continue the quotation in its brief, but the District Court does, stating that: "However, the Code outlines three 'triggering events' relevant to this case. Upon the happening of

any such event all or part of a life insurance company's PSA balance became taxable income." *Id.* Thus, contrary to plaintiff's claim that the *GE Life* decision stands for the proposition that amounts intended to pay policyholders claims could not be taxed, or that the statute is ambiguous, the *GE Life* court identified that upon the triggering of one of the three scenarios, including termination of either insurance or life insurance company status, the amounts in the company's PSA could be taxed. *See id.* at 798.

Although plaintiff cites *GE Life*, plaintiff relies heavily on the *Monat* court's decision to support its argument. In *Monat*, the court examined the PSA and Phase III tax provisions under the 1984 Act and found them to be ambiguous. A revised version of section 815 titled "Distributions to Shareholder from pre–1984 Policyholder Surplus Account," became effective on December 31, 1983, pursuant to the 1984 Act. The court in *Monat* explored the 1984 Act, which replaced the 1959 Act at issue in the instant case. The *Monat* court was charged with interpreting certain provisions of the 1984 Act, some of which referred to the 1959 Act's provisions regarding Phase III liability and PSA accounts. In its opinion, the *Monat* court first explored the literal language of both the 1984 and 1959 Acts, finding that, "[u]nder a literal reading of the 1959 Act, if, for any two successive years an insurance company failed to qualify as a life insurance company for federal tax purposes, all amounts in its PSA were to be included in Phase III taxable income under section 802(b)(3) for the last year in which the company qualified as a life insurance company." *Id.* at 1518. Thus, the *Monat* court recognized that, read literally, the 1959 Act regarded the entire PSA balance as taxable under these circumstances without regard to whether the PSA balance would otherwise be used to satisfy policyholders' claims. *See id.*

The *Monat* court rejected the literal language of both Acts because it found in the 1984 Act an ambiguity that caused it to examine the legislative history of the 1984 Act. As stated by the *Monat* court: "[t]he 1984 Act carried forward the triggering events provision of the old statute (I.R.C. § 815(d)),

but did not carry forward the mechanism for imposing a Phase III tax (I.R.C. § 802(b)(3)). Because of this ambiguity it is necessary to look outside the language of the 1984 Act." *Id.* The court stated: "Therefore ... the termination of life insurance company status triggered a subtraction of the PSA balance and imposition of Phase III tax, even when the company had been declared insolvent and all available funds had been earmarked to pay policyholder claims." *Id.*

The court turned to the language of the 1959 Act for additional guidance, finding that:

> The 1959 Act defined certain "triggering events," in former Section 815(d), which would end the tax deferred status of money held in a PSA. These events all resulted in money being "subtracted" from the PSA. Upon the occurrence of one of these events, the money subtracted from PSA would treated [sic] as income and subject to the Phase III tax, under former Section 802(b)(3). The 1984 Act carried forward the triggering event provision of the old statute (I.R.C. § 815(d)), but did not carry forward the mechanism for imposing a Phase III tax (I.R.C. § 802(b)(3)).

*Id.* at 1517–18. In examining the 1959 Act, the *Monat* court also observed that the title of the section, "Distributions to Shareholders," and references to distributions to shareholders, caused it to view the section as ambiguous. *Id.* at 1518. Explaining its conclusions regarding the ambiguities in the 1959 Act, the *Monat* court stated:

> [F]ormer Section 815, the section that defined the triggering events in which money is "subtracted" from a PSA and thus subject to the Phase III tax, is entitled "Distributions to Shareholders." In addition, Section 815(c) provided that the amount "subtracted" from a PSA is equal to the amount "distributed" out of the PSA. This use of the terms "distributed" and "distribution" was continued by the 1984 Act which defines the current version of the Phase III tax amounts as "direct and indirect distributions ... to shareholders from such account." I.R.C. § 815(a)(2).

These repeated references to distributions to shareholders lead the court to

conclude that the 1959 Act's language is ambiguous on the question of whether termination of life insurance company status automatically results in the PSA balance becoming taxable, even if earmarked solely for policyholder claims. Therefore, the court is required to look beyond the plain language of the statute to determine congressional intent.

*Id.* at 1518–19.

In examining the legislative history of the 1959 Act, the court found no clear indication of Congress's intent regarding Phase III tax liability in the event that the money used to pay the PSA taxation would otherwise end up in the hands of policyholders rather than shareholders. The court stated:

It is clear from the legislative history that Congress intended to tax any distribution from the tax-deferred PSA balance that benefitted shareholders in any way. The legislative history does not, however, provide any meaningful explanation for the provision that upon termination of a life insurance company's status as such, the PSA balance would be taxed.

*Id.* at 1519.

The court, therefore, adopted an interpretation of the Phase III PSA taxation provision that it found to be more consistent with its perception of the general purpose of the Phase III life insurance company taxation scheme. The *Monat* court summarized its perception of the congressional intent as preventing "shareholders from taking advantage of the tax deferral system by closing the company's doors but continuing to avoid tax liability on PSA amounts not needed for policyholder claims." *Id.* at 1520. From that, the *Monat* court concluded that Congress must not have intended to tax PSA dollars earmarked for receipt by policyholders because PSAs provide a " 'desirable 'cushion' for special contingencies which may arise in the case of the policies involved.' " *Id.* at 1519 (citing S.Rep. No. 291, 86th Cong., 1st Sess. (1959), *reprinted in* 1959 U.S.C.C.A.N. 1575, 1601). According to the *Monat* court, "[i]t would be contrary to Congressional intent to allow the Government to tax the cushion merely because it existed at the time the company became insolvent if doing so

pulls the cushion out from under the policyholders it was established to protect." *Id.* at 1519. The court, therefore, held that: "For these reasons, the court concluded that termination of life insurance company status does not trigger taxation of the PSA balance under the 1959 Act when none of [the PSA] balance will be distributed directly or indirectly to shareholders." *Id.* at 1520.

This court finds three problems with the rationale used by the *Monat* court. First, the court in *Monat* found ambiguity in the statute and resorted to the legislative history, despite finding a literal meaning supported by the plain language of the statute. *See id.* at 1517. The *Monat* court itself wrote: "The problem with applying the literal statutory language to the question in this case...." *Id.* By disregarding the literal language of the statute, the *Monat* court ignored the basic principles of statutory interpretation that counsel against this approach. If a statute is plain and unequivocal on its face, there is usually no need to resort to the legislative history underlying the statute. *See Circuit City Stores, Inc. v. Adams,* 532 U.S. at 119, 121 S.Ct. 1302 ("[W]e do not resort to legislative history to cloud a statutory text that is clear.") (quoting *Ratzlaf v. United States,* 510 U.S. at 147–148, 114 S.Ct. 655).

Second, the *Monat* court used the absence of specific language in the statute and the absence of "meaningful explanation" in the legislative history to bolster an interpretation that is supported by neither. *Monat Capital Corp. v. United States,* 869 F.Supp. at 1519. Regarding the absence of any provision in the plain language of the statute regarding distributions to policyholders, " 'courts have no authority to enforce [a] principl[e] gleaned solely from legislative history that has no statutory reference point.' " *Shannon v. United States,* 512 U.S. at 583–84, 114 S.Ct. 2419 (quoting *Int'l Bhd. of Elec. Workers, Local Union No. 474 v. NLRB,* 814 F.2d at 712). The Supreme Court has also counseled against using "ingenuity to create ambiguity" that does not otherwise exist in the statute. *Rothschild & Bro. v. United States,* 179 U.S. 463, 465, 21 S.Ct. 197, 45 L.Ed. 277 (1900).

Finally, although the 1984 Act removed the specific language in section 815(d)(2)(A)(ii) referring to a life insurance company's failure to qualify as a life insurance company for two years, section 815(f) of the 1984 revision carried forward and made applicable to PSAs any provisions of the 1959 Act that were not inconsistent with the 1984 Act. Section 815(f) of the 1984 Act states:

(f) Other rules applicable to policyholders surplus account continued.

Except to the extent inconsistent with the provisions of this part, the provisions of subsections (d), (e), (f), and (g) of section 815 (and of sections 6501(c)(6), 6501(k), 6511(d)(6), 6601(d)(3), and 6611(f)(4)) as in effect before the enactment of the Tax Reform Act of 1984 are hereby made applicable in respect of any policyholders surplus account for which there was a balance as of December 31, 1983.

26 U.S.C. § 815(f) (1984). Thus, section 815(f) of the 1984 revision recognizes that, while the 1984 Act ended PSAs, the PSA accounts that existed must still be managed and taxed appropriately.

Furthermore, legislative history lacking in "meaningful explanation" on the PSA taxation issue should not be used to displace the literal meaning of the statute. The Senate Report on the 1959 Act specifically stated that when certain "triggering events" occur "it becomes clear that the company itself has made the determination that additional amounts constitute income which was not required to be retained to fulfill the policyholder's contracts." *GE Life and Annuity Co. v. United States*, 127 F.Supp.2d at 799 (quoting Sen. Rep. No. 291, 86th Cong., 1st Sess. 20–21, *reprinted in* 1959–2 C.B. 778). A far more tenable conclusion dictates that the legislative history itself is ambiguous. Moreover, this court finds no clearer explanation in the general discussion of the legislative intent behind the 1959 Act.

The *Monat* court found that, in general, Congress designed the 1959 Act to "prevent shareholders from taking advantage of the tax deferral system by closing the company's doors but continuing to avoid tax liability on PSA amounts not needed for policyholder claims." *Monat Capital Corp. v. United*

*States*, 869 F.Supp. at 1520. This court finds no clear indication from any of the legislative history cited by plaintiff, or identified in the *Monat* court's decision, that Congress intended there to be an exception to the Phase III taxation of PSA funds that would otherwise pay policyholders' claims.

Moreover, the *Monat* court used the legislative history language of the 1984 Act to find the 1959 Act ambiguous. In so doing, the court ignored another maxim of statutory interpretation which states that "the views of one Congress as to the meaning of an Act passed by an earlier Congress are not ordinarily of great weight...." *United States v. X–Citement Video, Inc.*, 513 U.S. at 77 n. 6, 115 S.Ct. 464; *see also Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. at 118 n. 13, 100 S.Ct. 2051 ("Thus, even when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment."). In passing the 1984 Act, Congress altered the 1959 Act's scheme, and thereby created a tax provision that does not tax PSA funds earmarked for policyholders. From the literal language of the 1959 statute, Congress appears to have intended that the 1959 Act rendered taxable all PSA funds of twice nonqualifying life insurance companies, even if those PSA funds were earmarked to pay policyholders' claims. Congress' alteration of the previous Act's taxation scheme in 1984 says nothing about what Congress intended in 1959.

This court disagrees with the court in *Monat* because this court finds no ambiguity in the language of the 1959 Act, and the result dictated by the literal meaning of the statutes is not "so bizarre that Congress 'could not have intended' it...." *Weddel v. Sec'y of Dep't of Health and Human Servs.*, 23 F.3d at 391 (citing *Demarest v. Manspeaker*, 498 U.S. at 190–91, 111 S.Ct. 599).

As defendant correctly identified in a final hearing in this case, section 7806 of the 1959 and 1984 Acts requires that: "No inference, implication, or presumption of legislative construction shall be drawn or made by reason of the location or grouping of any particular

section or provision or portion of this title, nor shall any table of contents, table of cross references, or similar outline, analysis, or descriptive matter relating to the contents of this title be given any legal effect." 26 U.S.C. § 7806(b). Thus, the *Monat* court's reliance and reference to the title of section 815, "Distribution to Shareholders," is unpersuasive, because the statute requires the courts not to infer any intentions or meaning from the title of particular sections, which, in this case, would include any reference to distributions or shareholders.

With regard to the absence of any "meaningful explanation" in the legislative history, by adopting a meaning gleaned from only a general understanding of the legislative history of the 1959 Act, the *Monat* court and the plaintiff ignored the basic canons of statutory construction. "The starting point for interpretation of a statute 'is the language of the statute itself. Absent a clearly express legislative intention to the contrary, that language must ordinarily be regarded as conclusive.'" *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 835, 110 S.Ct. 1570, 108 L.Ed.2d 842 (1990) (quoting *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980)). Moreover, the Supreme Court has declined to contradict the literal language of a statute with the legislative history when "[t]he legislative history cited by petitioners is at best ambiguous" because such references lack a clear legislative intention or expression. *Buckhannon Bd. and Care Home, Inc. v. West Va. Dep't of Health and Human Res.*, 532 U.S. 598, 599, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001).

The government, in its arguments regarding the proper interpretation, makes an alternate argument, contending that "there were indirect or constructive distributions to Great Global's shareholders during the period 1983 through 1986; therefore, under section 815(d)(2)(A), the deferred tax on the 1983 PSA balance was required to be paid." Greene responds that "there have been no

'distributions,' directly or indirectly, to or for the benefit of Great Global's Shareholders." Whether or not Great Global made indirect or constructive distributions to its shareholders is an issue of fact and not subject to summary judgment. However, there is no need to address the issue at this time. A determination of whether constructive distributions were made is not material to the core issue of whether 26 U.S.C. §§ 802(b)(3) and 815(d)(2)(A)(ii) provide the exception relied on by the plaintiff. Moreover, because the court construes the statutes in the government's favor, there is no need to reach the government's alternate, factual argument. The PSA account taxation of twice non-qualifying life insurance companies does not offer an exception for funds earmarked for policyholder claims.

## B. Supremacy of Federal Law and the Arizona Priority Statutes

### 1. Plaintiff's Priority Argument

■ Plaintiff contends that Arizona law places claims of policyholders and the Arizona Guaranty Fund ahead of unsecured claims of the United States. Plaintiff argues that the McCarran–Ferguson Act, 15 U.S.C. § 1012 (2000),[13] which reserves to states the authority to govern the insurance industry, supplants 31 U.S.C. § 3713(a)(1)(A)(iii), the federal statute granting first priority to claims of the United States against insolvent entities. According to plaintiff, the Arizona priority statute, Arizona Revised Statutes § 60–629,[14] regulates the business of insurance and, therefore, under the McCarran–Ferguson Act, displaces the general federal priority statute.

To support its argument, plaintiff cites *United States Department of Treasury v. Fabe*, 508 U.S. 491, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). In *Fabe*, the Supreme Court examined an Ohio priority statute similar to the Arizona priority statute at issue in the instant case. The Ohio priority statute

---

**13.** 15 U.S.C. § 1012(b) reads in relevant part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance...."

**14.** As discussed below, there is an issue raised by the parties as to the version of this Arizona statute to be applied.

entitled claims of the federal government to fifth priority, behind (1) administrative expenses, (2) specified wage claims, (3) policyholders' claims and (4) claims of general creditors. *See id.* at 495, 113 S.Ct. 2202. The Court partially upheld the order of priority dictated by the Ohio statute, holding that state priority statutes can designate administrative expenses and policyholders' claims to receive priority over claims of the United States. *See id.* at 508–509, 113 S.Ct. 2202. The *Fabe* Court, however, held that specified wage claims and claims of general creditors may not receive priority over claims of the United States. *See id.*

The Supreme Court reasoned that the McCarran–Ferguson Act reserved to the states the power to regulate the "business of insurance." *Id.* at 493, 113 S.Ct. 2202. The Court further interpreted the "business of insurance" to include state laws enacted to protect policyholders through enforcing performance of insurance contracts. *Id.* at 505, 113 S.Ct. 2202. The *Fabe* Court recognized that the state priority statute at issue was "designed to carry out the enforcement of insurance contracts by ensuring the payment of policyholders' claims despite the insurance company's intervening bankruptcy." *Id.* at 504, 113 S.Ct. 2202. Applying this rationale to the Ohio statute, the Court wrote:

> [T]he Ohio priority statute, to the extent that it regulates policyholders, is a law enacted for the purpose of regulating the business of insurance. To the extent that it is designed to further the interests of other creditors, however, it is not a law enacted for the purpose of regulating the business of insurance.... We also hold that the preference accorded by Ohio to the expenses of administering the insolvency proceeding is reasonably necessary to further the goal of protecting policyholders.... The preferences conferred upon employees and other general creditors, however, do not escape pre-emption because their connection to the ultimate aim of insurance is too tenuous.

*United States Dep't of Treasury v. Fabe,* 508 U.S. at 508–09, 113 S.Ct. 2202. The Supreme Court remanded the case to the trial court because of a clash in priorities between the respective provisions of the federal statute and Ohio Code.

The Supreme Court had previously set forth a three-part standard for defining what constitutes "the business of insurance": first, whether the practice has the effect of transferring or spreading the risk of insurer insolvency; second, whether the practice is an integral part of the policy relationship between the insurer and the insured because it is designed to maintain the reliability of the insurance contract; and third, whether the practice is limited to entities within the insurance industry. *See id.* at 497–98, 113 S.Ct. 2202 (quoting *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982)). The Supreme Court has recognized, however, that these three requirements represent only "checking points or guideposts" and are not firm requirements for finding that a state statute regulates the business of insurance. *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. 329, 333, 123 S.Ct. 1471, 155 L.Ed.2d 468, (2003) (quoting *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. at 129, 102 S.Ct. 3002); *UNUM Life Ins. Co. of America v. Ward,* 526 U.S. 358, 373, 119 S.Ct. 1380, 143 L.Ed.2d 462 (1999) ("We have indicated that the McCarran–Ferguson factors are 'considerations [to be] weighed' in determining whether a state law regulates insurance."). Ultimately, the Supreme Court, in reviewing the McCarran–Ferguson Act under the Employee Retirement Income Security Program, stated that, "[t]oday we make a clean break from the McCarran–Ferguson factors and hold that for a state law to be deemed a 'law ... which regulates insurance' under § 1144(b)(2)(A), it must satisfy two requirements. First, the state law must be specifically directed toward entities engaged in insurance. Second, as explained above, the state law must substantially affect the risk pooling arrangement between the insurer and the insured." *Kentucky Ass'n of Health Plans, Inc. v. Miller,* 538 U.S. at 341–42, 123 S.Ct. 1471. Thus, the Supreme Court did not intend that the three factors identified in *Fabe* be required or satisfied for a court to determine that a state law regulates the business of insurance.

In earlier cases in which the Supreme Court reviewed the McCarran–Ferguson Act, the Court had emphasized the necessity under the Act to protect policyholders. For example, in *Pireno,* the court found that the use of a peer review committee to advise an insurer as to whether chiropractic charges were reasonable was not part of the business of insurance. Rather, the court found the peer review process as an aid to decision making to be "a matter of indifference to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid." *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. at 120, 102 S.Ct. 3002 (emphasis in original). Similarly, in *Group Life and Health Insurance Company v. Royal Drug Company,* the court found agreements between insurance companies and their participating pharmacies too tenuous to be considered "business of insurance." *See Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 213–14, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), *reh'g denied,* 441 U.S. 917, 99 S.Ct. 2017, 60 L.Ed.2d 389 (1979).

While *Pireno* and *Royal Drug* interpreted the second clause of 15 U.S.C. § 1012(2)(b) of the McCarran–Ferguson Act, which addresses antitrust laws, the Supreme Court nevertheless noted that the purpose of the McCarran–Ferguson Act was to protect policyholders. *See United States Dep't of Treasury v. Fabe,* 508 U.S. at 504, 113 S.Ct. 2202. In particular, when construing the phrase "for the purpose of regulating the business of insurance," the Supreme Court emphasized the importance of ensuring payment to policyholders under insurance contracts. To this end, the *Fabe* Court noted that:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement-these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was-it was on the relationship between the insurance company and the policyholder.

*United States Dep't of Treasury v. Fabe,* 508 U.S. at 501, 113 S.Ct. 2202 (quoting *SEC v. Nat'l Secs. Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969)). Therefore, in *Fabe,* the Supreme Court found that "[u]nder the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), federal law must yield to the extent the Ohio statute furthers the interests of policyholders." *Id.* at 502, 113 S.Ct. 2202.

In the case currently before the court, the plaintiff urges the court to apply *Fabe,* arguing that the Arizona priority statute, Arizona Revised Statutes § 60–629, places policyholders' claims ahead of claims by the United States. Plaintiff also asks this court to determine whether the Arizona Guaranty Fund is part of the "business of insurance," to the extent that guaranty fund claims are entitled to the same priority as policyholder claims under the Arizona priority statute and the McCarran–Ferguson Act. Plaintiff contends that, under the McCarran–Ferguson Act, the federal super-priority provided by 31 U.S.C. § 3713(a)(1)(A)(iii) does not apply because the Arizona Guaranty Fund and the Arizona priority statute protect policyholders and regulate the "business of insurance." This issue appears not to have been previously addressed in this Circuit.

The dispute in this case arises from the inherent conflicts between the relevant state and federal statutes. *See Boozell v. United States,* 979 F.Supp. 670, 676 (N.D.Ill.1997). Therefore, this court must review the purpose of the Arizona insurance statute, as well as the relevant case law on guaranty fund priority claims. In general, federal case law addressing whether guaranty funds have priority over claims by the federal government is sparse. However, of the few cases that have addressed the issue, each one has held that guaranty funds are entitled to protection under the McCarran–Ferguson Act. *See Ruthardt v. United States,* 303 F.3d 375 (1st Cir.2002), *cert. denied sub nom. Bowler v. United States,* 538 U.S. 1031, 123 S.Ct. 2072, 155 L.Ed.2d 1059 (2003), and *cert. denied sub nom. Alabama Ins. Guar. Ass'n v. United States,* 538 U.S. 1031, 123 S.Ct. 2072, 155 L.Ed.2d 1059 (2003); *Boozell v. United States,* 979 F.Supp. at 670. None of these cases, however, are precedential in this court.

In *Ruthardt*, the First Circuit reviewed a Massachusetts priority statute under the McCarran–Ferguson Act to determine whether guaranty fund claims had priority over claims by the United States. *See Ruthardt v. United States*, 303 F.3d at 379. Like the plaintiff in the case currently before the court, the Massachusetts Commissioner of Insurance argued that the McCarran–Ferguson Act protected the state priority statute, which preferred claims by guaranty funds arising out of their payments to policyholders ahead of claims by the United States. *Id.* at 380. The *Ruthardt* court upheld the Massachusetts statute, stating that "[t]he priority that Massachusetts affords to guaranty funds is part and parcel of an integrated regime aimed at the protection of policyholders." *Id.* at 382.

In granting guaranty funds higher priority than federal claims, the *Ruthardt* court examined *Fabe* and rejected the argument that the Supreme Court intended to limit priority only to actual policyholders. *Id.* at 381–82. Instead, the First Circuit held that since guaranty funds are intended to protect policyholders, they accordingly deserve a higher priority than claims by the federal government, in part because the "obligations of the guaranty funds to pay covered policy claims exists whether or not the guaranty funds are then reimbursed." *Ruthardt v. United States*, 303 F.3d at 381. The court stated that "priorities that indirectly assure that policyholders get what they were promised can also trigger McCarran–Ferguson protection; the question is one of degree, not of kind." *Id.* at 382. Thus, the First Circuit found that "the guaranty funds are little more than a mechanism for advancing the money to pay policyholders promptly...." *Id.*

In reaching its decision, the First Circuit focused on the importance of reimbursements made to the Massachusetts guaranty funds. The court stated that "[r]eimbursements to the funds are a significant source of revenue for making covered payments to policyholders." *Id.* at 382. In essence, the First Circuit equated making reimbursement payments to guaranty funds with making payments directly to policyholders because

"[w]ithout the priority for such reimbursements, payments to policyholders could in practice be less secure and would at the very least be delayed in some instances. Prompt payment is one of the main benefits of guaranty funds." *Id.* The *Ruthardt* court also wrote: "Yet the guaranty funds are little more than a mechanism for advancing the money to pay policyholders promptly and then recovering those advances out of the estate assets, ahead of the United States, just as the policyholders could have done directly." *Id.* at 382. Accordingly, the *Ruthardt* court held that because the purpose of the guaranty fund was to protect policyholders and ensure payments on insurance contracts, guaranty funds are appropriately accorded higher priority than federal claims.

Similarly, in *Boozell v. United States*, the United States District Court for the Northern District of Illinois reviewed an Illinois priority statute to determine whether guaranty funds should be accorded higher priority than federal claims. *See Boozell v. United States*, 979 F.Supp. 670 (N.D.Ill.1997). Like *Ruthardt*, the *Boozell* court also equated making payments to guaranty funds with making payments to policyholders. In *Boozell*, however, the court applied a state statute that assigned to the guaranty fund any amounts paid to policyholders. *See id.* at 678 ("Policyholders who receive payments on other benefits from a guaranty association are deemed to have assigned their rights under the covered policies to the association to the extent of the benefits provided. Thereafter, the guaranty association is entitled to the same priority as the policyholders would have had with respect to the assigned claims in distributions from the insolvent insurer's estate") (citing 215 ILL. COMP. STA. 5/545(a),(b), 5/531.08(12)). The *Boozell* court found that the Illinois priority statute was enacted for the purpose of regulating the business of insurance and, therefore, under McCarran–Ferguson, was not preeempted by the federal priority statute.

To reach its decision, the *Boozell* court also expanded the narrow protection afforded to policyholders in *Fabe* by relying upon the United States Court of Appeals for the Second Circuit's decision in *Stephens v. Ameri-*

*can International Insurance Company,* 66 F.3d 41 (2nd Cir.1995). The *Boozell* court found that the *Fabe* holding attempted to give meaning to the plain wording of the McCarran–Ferguson Act by exempting any state law which directly or indirectly protects policyholders from federal preemption. *See Boozell v. United States,* 979 F.Supp. at 678. In *Stephens,* the Second Circuit found that an anti-arbitration provision of the Kentucky Liquidation Act was enacted "for the purpose of regulating the insurance business" and, therefore, was not preempted by the federal priority statute. *Stephens v. Am. Int'l Ins. Co.,* 66 F.3d at 46. The *Stephens* court reasoned that "[i]t is crucial to the 'relationship between [an] insurance company and [a] policyholder' that both parties know that in the case of insolvency, the insurance company will be liquidated in an organized fashion." *Id.* at 44–45.

On the other hand, the *Stephens* court, like the court in *Boozell* rejected the First Circuit's reasoning in *Garcia v. Island Program Designer, Inc.,* 4 F.3d 57 (1st Cir.1993). In *Garcia,* the court held that the federal superpriority statute preempted a Commonwealth of Puerto Rico filing deadline-related priority provision. *See id.* at 62. The Commonwealth provision provided that creditors making claims could file claims past the deadline for filing claims specified by the Insurance Commissioner, but that no claims filed after the deadline would be allowed until all timely filed claims had been fully paid. *See id.* at 60–61 (citing P.R. Laws Ann., tit. 26, § 4019(2)).

In *Garcia,* the court rejected the Insurance Commissioner's argument that the McCarran–Ferguson Act upheld the filing-deadline statute on two grounds. First, the court found that the filing provision, with its priority deadlines, did not "regulate policyholders" because it was neither "directed at, nor necessary for, the protection of policyholders as [the *Fabe* ] Court required." *Garcia v. Island Program Designer, Inc.,* 4 F.3d at 62. Second, the *Garcia* court found that the Commonwealth's filing deadline provision was not "necessary for the protection of policyholders." *Id.* In short, the *Garcia* court found the deadline priority provision too ten-

uous for the McCarran–Ferguson Act to apply in that it did not have sufficient nexus to the goal of protecting policyholders.

As the *Ruthardt* court stated in its opinion, the Supreme Court has read the McCarran–Ferguson Act "more narrowly than literally," making this an extremely close case. *Ruthardt v. United States,* 303 F.3d at 382. In the case currently before the court, after reviewing the relevant statutes and case law, this court agrees with the holdings in *Ruthardt* and *Boozell,* and holds that the Arizona Insurance Statute "regulates the business of insurance," and properly grants the Arizona Guaranty Fund priority over claims by the United States.

Although the Supreme Court did not address plaintiff's guaranty fund issue directly, the *Fabe* court, and the subsequent cases interpreting *Fabe,* focused on protecting the policyholder. *Id.* at 511, 113 S.Ct. 2202. Certainly, a policyholder is best protected if his or her claim can be paid, even when an insurance company is insolvent. The cases that have rejected application of the McCarran–Ferguson Act to state statutes, such as *Garcia* and *Pireno,* have done so because those courts found that the state statutes under review were not enacted to protect policyholders. *See Garcia v. Island Program Designer, Inc.,* 4 F.3d at 59.

The purpose of the Arizona Guaranty Fund is to ensure insurance contract completion and to protect the interests and rights of the policyholders. If a creditor were to collect on a claim directly from the assets of an insurance company, the government in this case concedes that the policyholder is entitled to priority ahead of the United States. If, however, the same policyholder were to recover from the Arizona guaranty fund, the United States attempts to lay claim to the remaining assets of the insurance company not used directly for the policyholder's claim, rather than providing for repayment to the guaranty fund for use to pay other policyholders' claims. This action results in actually increasing the United States' priority to assets which would have been used to pay claims but for the guaranty fund. As the *Ruthardt* court described, this would be a "perverse result." *Ruthardt v. United*

*States*, 303 F.3d at 382. This court, therefore, holds that the Guaranty Funds are entitled to priority ahead of claims by the United States.

Likening this case to *Pireno*, the defendant argues that, "the source of the [guaranty] fund's reimbursement is of no interest to an individual policyholder." *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S at 132, 102 S.Ct. 3002 (finding the peer review process to be "a matter of indifference to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid."). This argument is not dispositive in the instant case. Unlike in *Pireno*, in which the peer review committee was ascertaining how much a policyholder should be paid, and the nexus to the interests of the policyholder is more attenuated, a state guaranty fund actually pays the policyholder when an insurance company is insolvent. The Arizona guaranty fund is designed protect the policyholder, and, logically, merits McCarran–Ferguson protection. *See SEC v. Nat'l Secs., Inc.*, 393 U.S. at 460, 89 S.Ct. 564 ("Statutes aimed at protecting or regulating this relationship [between the insurance company and the policyholder] directly or indirectly are laws regulating the 'business of insurance.'").

In 1977, the Arizona Legislature adopted the 1975 Life and Health Guaranty Association Model Act of the National Association of Insurance Commissioners. In addressing the purpose of the 1975 Model Act, and finding the purpose applicable to Arizona's Life and Disability Insurance Guaranty Fund Act, the Arizona Supreme Court wrote:

> [T]he purpose of this Act is to protect policy owners, insureds, beneficiaries, annuitants, payees, and assignees of life insurance policies, health insurance policies, annuity contracts, and supplemental contracts, subject to certain limitations, against failure in the performance of contractual obligations due to the impairment or insolvency of the insurer issuing such policies or contracts.

*Arizona Life & Disability Ins. Guar. Fund v. Honeywell, Inc.*, 190 Ariz. 84, 945 P.2d 805, 808 (1997); *see also Bills v. Arizona Prop. & Cas. Ins. Guar. Fund*, 194 Ariz. 488, 984 P.2d 574, 577 (App.1999), *review dismissed*, 195 Ariz. 574, 991 P.2d 804 (1999) (stating that the purpose of the guaranty fund is "to provide for the payment of claims under certain insurance policies to avoid excess delay in payment and financial loss to claimants or policyholders because of the insolvency of an insurer.") (quoting *Wells Fargo Credit Corp. v. Arizona Prop. & Cas. Ins. Guaranty Fund*, 165 Ariz. 567, 799 P.2d 908, 909 (App. 1990)) (citing A.R.S. § 20–661 *et seq.*).

The government also contends that the Arizona priority statute is invalid because the United States Supreme Court did not address directly the validity of granting priority to claims of state guarantee funds and that extending the *Fabe* decision to include creditors such as guaranty funds is exactly what the Supreme Court hoped to avoid.[15] From this, defendant contends that the *Fabe* decision must have foreclosed the possibility that claims of state guarantee funds receive priority over claims of the United States. In *Fabe* however, the Supreme Court was not asked to address guaranty funds, and the arguments and logic set forth in *Fabe* do not support defendant's argument. The *Fabe* Court held that the focus of applying the McCarran–Ferguson Act is to protect the policyholder. *See United States v. Fabe*, 508 U.S. at 511, 113 S.Ct. 2202.[16]

---

**15.** Responding to the dissent's criticism that the majority's decision was so broad that "any law which redounds to the benefit of policyholders is, *ipso facto*, a law enacted to regulate the business of insurance...," the *Fabe* Court stated how that was "precisely the argument we reject in the text, as evidenced by the narrowness of our actual holding." *United States v. Fabe*, 508 U.S. at 509 n. 8, 113 S.Ct. 2202.

**16.** The *Fabe* court also upheld a priority for administrative expenses, stating that: "We also hold that the preference accorded by Ohio to the expenses of administering the insolvency proceeding is reasonably necessary to further the goal of protecting policyholders." *United States v. Fabe*, 508 U.S. at 509, 113 S.Ct. 2202. Included in the Ohio Code's administrative expenses were costs payable to the Guaranty Fund. While this court does not directly rely on this aspect of the *Fabe* decision, a strong argument and analogy can be made that reimbursements to the Arizona guaranty fund are within the parameters of the kind of administrative expenses anticipated by the *Fabe* court.

In the instant case, plaintiff correctly argues that the Arizona Guaranty Fund should have priority over government claims because it is part of a state statute that protects and regulates the relationship between the policyholder and the insurer. The Arizona statute is designed to carry out the completion of insurance contracts by ensuring payment of policyholder's claims despite an insurance company's intervening bankruptcy, as required under *Fabe. See United States v. Fabe,* 508 U.S. at 504, 113 S.Ct. 2202.

## 2. Plaintiff's Retroactivity Argument

Although this court holds that the Arizona Guaranty Fund is entitled to priority ahead of claims by the federal government, the issue of how Arizona prioritizes creditors in its distribution statute was raised by the plaintiff in this case. In the present case, the plaintiff seeks a refund for a tax return filed and paid in 1990. However, the plaintiff asks this court to apply the 1997 version of Arizona's priority statute, Arizona Revised Statutes § 60–629 (1997). In the 1997 version, the Arizona legislature ranked creditor priorities in an insurance bankruptcy situation in the following order: 1) administrative expenses, 2) claims of the guaranty funds, 3) claims of policyholders, and 4) claims of the United States. *See id.*

Plaintiff bases its retroactivity argument on a Historical and Statutory Note following section 60–629 (1997). That note reads:

> This act applies to all delinquency proceedings begun after the effective date of this act and to all delinquency proceedings pending on the effective date of this act in which a final distribution in payment of claims has not been made, other than a distribution to claimants under § 20–629, subsection A, paragraph 1, Arizona Revised Statutes, or an early access distribution to insurance guaranty funds.

ARIZ. REV. STAT. § 60–629 (1997) (citing 1997 Ariz. Sess. Laws Ch. 272, §§ 2 and 3).

Plaintiff argues that the 1997 statute applies because "[i]t is undisputed that the Great Global delinquency proceedings were pending as of the effective date of this statute and that no final distribution has yet been made in the matter." Plaintiff also points out that the clear language of the 1997 statute states that it applies to all proceedings in which a final distribution in payment of claims has not been made. *See* ARIZ. REV. STAT. § 60–629 (1997). The defendant challenges plaintiff's argument and contends that the 1977 statutory version should apply. Defendant argues that, when the tax was paid in 1990, the statutory version was the same as the 1977 version, and that there was no conflict with the Federal Insolvency Priority Statute.

Since its inception in 1939, the Arizona priority statute has been amended five times: in 1977, 1991, 1993, 1997 and 2001. The significant dates for this case are: December 31, 1985, when Great Global failed to qualify as a life insurance company pursuant to 26 U.S.C. § 815(d)(2)(A)(ii); February 7, 1986, when the Arizona Supreme Court declared Great Global insolvent; June 8, 1988, when the court ordered an liquidation order; and July 9, 1990 when Great Global's Receiver filed an amended 1983 tax return and paid $699,849.00.

Plaintiff's argument that the 1997 statute should apply fails, however, because the Arizona legislature also changed the statute in 2001, and plaintiff asks this court to arbitrarily pick a statute that falls in between the year the payment occurred, 1990, and a recodification of the Arizona statute, 2001. Outside of the retroactivity language, the plaintiff presents no reason why the 1997 statute applies and not the 2001 or 1977 statutes.

When the Arizona legislature changed section 20–629 in 1993, they restructured the statute significantly to give clear rankings to the priority of creditors during an insolvency. *See* ARIZ. REV. STAT. § 20–629 (1993). The 1993 statute, established after *Fabe,* more clearly placed guaranty funds and policyholder claims above claims by the federal government.[17] *See id.* Before 1993, the priority

---

**17.** The 1993 version was later changed in 1997. Among the significant changes in 1997 was the removal of employee claims from a priority

above that of the federal government as directed by *Fabe. See United States v. Fabe,* 508 U.S. at 508, 113 S.Ct. 2202 ("We hold that the Ohio

statute's language was not as clear and did not mention specifically guaranty funds directly in the statute. The 1977 statute stated only that "[u]npaid claims ... which arise out of and are within the coverage of insurance policies issued by the insolvent insurer shall have preference over and shall be paid prior to payments of claims of general creditors." ARIZ. REV. STAT. § 20–629(E) (1977).

Whether the revised statute mentioned guaranty funds directly or not, the Arizona statute has continuously required that "[a]ny person recovering pursuant to this article shall be deemed to have assigned his or her rights under the policy to the fund to the extent of his or her recovery from the fund." ARIZ. REV. STAT. § 20–672(A) (1977 and 2001). Thus, in 1993, when Arizona began mentioning guaranty funds in section 20–629, the Arizona legislature recognized what it had been practicing since the statute's inception, that guaranty funds protect and pay policyholder claims. Furthermore, the guaranty fund could bring a claim against a policyholder only if the policyholder first collects from the guaranty fund and in some manner assigns or surrogates his or her claim to the fund. Section 20–672 bypasses any independent assignment by the policyholder, and deems any amount received by policyholders statutorily assigned to the guaranty fund.

While the placement of claims of the guaranty fund ahead of those of policyholder claims in the 1997 version seems at odds with the Model Act and the federal cases discussed above, either way, this ranking has no affect on the government's lower priority to both policyholders and the guaranty fund as discussed and found by this court above. It appears that resolution of priority rankings under the state statute is a question for the Arizona courts to resolve. Moreover, whether the statute itself places guaranty funds ahead of federal claims, or guaranty funds are assigned by statute, the result is the same—guaranty funds serve to directly protect the policyholder and, therefore, enjoy a

higher priority than the claims pursued by the IRS.

## CONCLUSION

On December 31, 1985, when Great Global failed to qualify as a life insurance company for two years, it triggered Phase III tax liability under 26 U.S.C. § 815(d)(2)(A)(ii). Accordingly, all amounts remaining in its Policyholder Savings Account became taxable. On February 7, 1986, the Superior Court of Arizona declared Great Global insolvent, making the Arizona Guaranty Fund responsible for paying its policyholders claims. Great Global's receiver filed an amended 1983 tax return in 1990, paying $699,849.00 based on the amounts remaining in the Policyholders Savings Account on December 31, 1985. After reviewing the arguments presented and the relevant case law, this court holds that the Arizona Guaranty Fund was entitled to priority claims ahead of the federal government's tax claim and that, therefore, Great Global is entitled to a complete refund of $699,849.00, plus interest. This court, therefore, **DENIES** defendant's motion for summary judgment and **GRANTS** plaintiff's motion for summary judgment. The Clerk of the Court shall enter **JUDGMENT** in accordance with this opinion. Each party shall bear it's own costs.

---

priority statute, to the extent that it regulates policyholders, is a law enacted for the purpose of regulating the business of insurance. To the extent that it is designed to further the interests of other creditors, however, it is not a law enacted for the purpose of regulating the business of

insurance."). However, the guaranty fund's priority did not change relative to the federal government and remained ahead of "Claims of the federal government, except ... claims that are treated as secured claims." ARIZ. REV STAT. § 20–629(A)(4) (1997).